[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12112

_____

D.C. Docket No. 5:12-cv-00635-WTH-PRL

VINCENT SALVATO,
as Personal Representative of the Estate of Joshua Salvato,
for the benefit of Vincent Salvato, surviving parent, Ana Rodriguez,
surviving parent,

Plaintiff-Appellee,

versus

DEPUTY LAUREN MILEY,
in her individual capacity,

Defendant-Appellant.

_____

No. 14-13424

_____

D.C. Docket No.  5:12-cv-00635-WTH-PRL

VINCENT SALVATO,
as Personal Representative of the Estate of Joshua Salvato,
for the benefit of Vincent Salvato, surviving parent, Ana Rodriguez,
surviving parent,

Plaintiff-Appellee,

versus

CHRIS BLAIR,
in his official capacity as Sheriff of Marion County, Florida,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(June 25, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

These consolidated appeals require us to decide two questions arising out of

an attempted arrest in which Deputy Lauren Miley shot and killed Joshua Salvato:

(1) whether Miley is entitled to qualified immunity against a claim for damages, 42

U.S.C. § 1983, for excessive force in violation of Salvato's rights under the Fourth

Amendment; and (2) whether the sheriff of Marion County can be held liable for

Salvato's death, *id.*, on the ground that he "ratified" Miley's use of excessive force

by failing to investigate the incident. Miley and Deputy Norman Brown attempted

to arrest Salvato after investigating reports that he was yelling at passing cars along

a Florida road. Salvato struggled, and the officers exchanged blows with Salvato.

Without warning, Miley shot Salvato in the abdomen as he backed away from the

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

officers. Brown then discharged his Taser into Salvato 12 times, including multiple times after Miley had handcuffed Salvato. Salvato died from internal bleeding from the gunshot wound. The sheriff of Marion County did not order an internal affairs investigation of the incident; he instead relied on investigations by a Florida grand jury and the Florida Department of Law Enforcement. The sheriff took no disciplinary action against Miley. Salvato's estate filed an action for damages against Miley in her individual capacity and the sheriff in his official capacity, *id.* The district court denied Miley's motion for summary judgment based on qualified immunity, and Miley appealed. When the claims against the sheriff went to trial, the jury returned a verdict in favor of Salvato's estate, and the district court later denied the sheriff's motion for judgment as a matter of law. The sheriff appealed, and we consolidated his appeal with Miley's appeal.

We affirm in part and reverse in part. When we view the facts in the light most favorable to Salvato, we conclude that it is clearly established that Miley's use of deadly force was excessive and that she should have intervened against Brown's use of excessive force. We affirm the denial of Miley's motion for qualified immunity and remand for further proceedings. But the record contains no evidence that Miley's violation of Salvato's federal civil rights was attributable to the sheriff. Because a single failure to investigate an incident is insufficient to

3

establish ratification, we reverse the denial of the sheriff's motion for judgment as a matter of law and render a judgment in his favor on the claim of excessive force.

## I.    BACKGROUND

We divide our discussion of the background in three parts. First, we explain the incident that led to Salvato's death. Second, we explain the response of the sheriff to that incident. Third, we explain the procedural history.

### A. *The Shooting*

At night, Miley responded to reports of a disturbance along Southeast Sunset Harbor Road in Marion County, Florida, that a "Hispanic looking male with no shirt" was "yelling and cussing at passing cars." Miley found Salvato along the side of the road. He was alone, walking in the road, shirtless, with nothing in his hands. Miley instructed Salvato to come to her car, and he complied. He did not have a weapon nor was he aggressive as he walked over. Without being asked, he put his hands on the hood of the car and spread his legs apart. Miley did not handcuff him because she did not perceive him to be a threat. Miley asked him if he had any weapons, and he replied that "all [he] had was bread," and he pulled bread out of his pockets. Miley did not pat him down, but she saw that there were no weapons tucked inside his waistband. According to Miley, Salvato "was just talking irrationally" and stated "he wasn't going to jail," even though Miley never mentioned jail. He tried to walk away twice, but both times Miley placed her hand

4

on his chest to keep him from leaving. Miley felt intimidated and called for expedited backup.

Deputy Brown arrived, and much of the remaining incident was recorded by his in-car dashboard camera. When Brown arrived, Salvato and Miley were talking to one another, arms-length apart, and there was no apparent confrontation. When Brown exited the vehicle he did not communicate with Miley but instead drew his gun and ordered Salvato to the ground. Salvato looked surprised but immediately complied. Brown pulled Salvato's arms backwards. When Miley attempted to handcuff Salvato, he began to struggle. He rose to his knees, and both deputies attempted to wrestle him to the ground. They exchanged blows. Salvato broke free and stepped backwards, away from the officers. Brown then began to reach for something from his belt, and Salvato rushed towards Brown and hit him again. Miley attempted to intervene, and Salvato hit her in the head, knocking her down. Salvato again retreated, this time far enough that he was outside of the view of the camera, around 10 to 15 feet away from Miley. Miley drew her handgun and shot Salvato in the abdomen without giving him any verbal warning.

Although he had been shot, Salvato continued to walk on the road. Brown ordered Salvato to get on the ground, and when Salvato did not comply, Brown discharged his Taser into Salvato. Salvato fell to the ground on his back after the Taser discharged. Brown ordered Salvato to roll onto his stomach and discharged

5

the Taser again when Salvato did not immediately comply. Brown ordered Salvato to show his hands, and Brown again discharged the Taser when Salvato did not comply. As Brown continued to discharge the Taser, Miley communicated for emergency medical assistance, retrieved her flashlight from the ground, and took Brown's handcuffs to restrain Salvato. The internal memory of the Taser recorded 12 discharges during the incident. Brown discharged the Taser multiple times after Miley handcuffed Salvato. Brown later asserted that he did so to keep Salvato from reaching into his back pockets. Miley also kicked Salvato's hand at one point when it appeared to her that he was trying to reach into his back pocket. Miley later testified that she was capable of telling Brown to stop discharging the Taser, but she did not because she "had just gone through a traumatic event, and [she] wasn't really thinking about what [Brown] was doing." At no point did either deputy check Salvato's back pockets or search him. Salvato was unarmed.

By the time paramedics arrived, Salvato had died from internal bleeding. Miley suffered no injuries, and Brown sustained a minor eye injury.

### B. The Response of the Sheriff's Office

A Marion County Sheriff's Office Operations Directive details the required response to a police shooting. The directive requires a supervisor to submit a "Green Team Report" of "recommendations and/or action taken." That report is an internal investigation by the Sheriff's Office to determine whether a deputy has

6

violated any policies or directives. The directive requires that, when a police shooting results in a death, the State Attorney's Office and the Florida Department of Law Enforcement must be notified, and one of these offices or the Sheriff's Office conducts an investigation.

After the Florida Department conducted an investigation, the State Attorney presented the case to a grand jury to decide whether to file criminal charges. The grand jury did not indict Miley. The investigation by the Florida Department did not provide any opinion about whether Miley violated Salvato's constitutional rights or the policies and directives of the Sheriff's Office. The investigation by the Department was limited to a determination about criminality.

The sheriff testified that he decided not to order an internal affairs investigation. He concluded that the investigation by the Florida Department and the grand jury report were "sufficient to cover all of our policies." The sheriff created a "task force committee" of "senior leaders" to review the reports from the grand jury and the Department, but that committee was "only set up to look at the external reports." The sheriff took no disciplinary action against Miley, but he did reassign her to a corrections officer post.

## C. Procedural History

Salvato's estate, represented by his father, Vincent Salvato, filed a complaint against Miley and Brown in their personal capacities and the sheriff in his official

7

capacity. Salvato's estate sought damages for Brown's and Miley's use of excessive force, 42 U.S.C. § 1983, and sought damages from the sheriff because the sheriff "ratified" their use of excessive force by "failing to conduct his own internal investigation of the . . . incident." Salvato's estate also alleged that Miley and the sheriff were liable for the wrongful death of Salvato under Florida law, Fla. Stat. §§ 768.16–.26.

Miley and the sheriff moved for summary judgment. The district court denied Miley's motion for summary judgment based on qualified immunity, and Miley appealed that denial to our Court. The district court denied the sheriff's motion for summary judgment on the ratification claim as it related to Miley's shooting.

The remaining claims went to trial. The jury found that the sheriff failed to investigate the incident and that failure "ratified" Miley's use of excessive force. With regard to the state claim of wrongful death, the jury found that Miley had used excessive force against Salvato, but the jury found her not liable because she had not acted in "bad faith," as required by Florida law. The jury also found the sheriff liable for wrongful death under Florida law.

The sheriff filed motions for judgment as a matter of law on the claim of excessive force at the close of evidence and after the jury returned its verdict, and

8

the district court denied both. The sheriff appealed to our Court, and after oral argument we consolidated his appeal with Miley's earlier appeal.

## II.    STANDARD OF REVIEW

We review *de novo* the denial of a motion for summary judgment based on qualified immunity, and we make all reasonable factual inferences in the light most favorable to the non-moving party.  *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004). Likewise, we review *de novo* a denial of a judgment as a matter of law, and we consider the evidence in the light most favorable to the non-moving party. *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012).

## III.    DISCUSSION

We divide our discussion in two parts. First, we explain that Miley is not entitled to qualified immunity for her use of excessive force against Salvato or for her failure to intervene against Brown's use of excessive force. Second, we explain that the district court erred when it denied the sheriff judgment as a matter of law because a single failure to investigate a constitutional violation is insufficient to establish ratification.

### A. Miley Is Not Entitled to Qualified Immunity.

"In resolving questions of qualified immunity at summary judgment," we first ask "whether the facts, [t]aken in the light most favorable to the party

9

asserting the injury, . . . show the officer's conduct violated a [federal] right."

*Tolan v. Cotton*, __ U.S. __, __, 134 S. Ct. 1861, 1865 (2014) (internal quotation

marks and citation omitted). We must then decide "whether the right in question

was 'clearly established' at the time of the violation." *Id*. at 1866. (citation

omitted). "[T]he salient question . . . is whether the state of the law at the time of

an incident provided 'fair warning' to the defendants that their alleged [conduct]

was unconstitutional." *Id*. (internal quotation marks and citation omitted). "We do

not require a case directly on point, but existing precedent must have placed the

statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, __ U.S.

__, __, 131 S. Ct. 2074, 2083 (2011). That is, "every 'reasonable official would

have understood that what he is doing violates [the plaintiff's] right.'" *Id.* (quoting

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)).

Salvato's estate argues that Miley violated Salvato's constitutional rights in

two ways. First, she personally used excessive force against him when she shot

him. Second, she failed to intervene when Brown used excessive force against

Salvato by repeatedly discharging his Taser into Salvato.

We divide our discussion in two parts. First, we explain that Miley is not

entitled to qualified immunity on the claim that she used excessive force. Second,

we explain that Miley is not entitled to qualified immunity on the claim that she

failed to intervene against Brown's use of excessive force.

10

1. Miley Is Not Entitled to Qualified Immunity with Respect to Her Alleged Use of Excessive Force.

Salvato's estate argues that Miley used excessive force against him when she shot him while he was retreating and when she kicked his hand after he was handcuffed. "We analyze a claim of excessive force under the Fourth Amendment's 'objective reasonableness' standard." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867 (1989)). "[T]o determine whether the use of force is 'objectively reasonable,' we carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." *Id*. (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871). "We measure the quantum of force employed against these factors—the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Id*. But we must not "mechanical[ly] appl[y] . . . these factors." *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010). "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007). "[M]ore force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002).

11

"[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S. Ct. at 1872 (internal quotation marks omitted). The use of deadly force is "more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force." *Penley*, 605 F.3d at 850 (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S. Ct. 1694, 1701–02 (1985)). Also relevant is whether the officer "had [an] articulable basis to think [the suspect] was armed." *Garner*, 471 U.S. at 20, 105 S. Ct. at 1706.

When we view the facts in the light most favorable to Salvato's estate, we conclude that Miley's use of deadly force was excessive. The initial "crime" for which she seized Salvato was only "yelling and cussing" at passing cars, and when Miley shot Salvato, he was not an "immediate threat," *Oliver*, 586 F.3d at 905, to either officer. Salvato was retreating, apparently unarmed, and outside of striking distance. Miley argues that Salvato had backed up once before, so his retreat was more akin to the "stance" of a "trained fighter," but the video evidence establishes

12

that Salvato's second retreat was further than the first. Moreover, Miley did not give any warning, though a jury could find that the distance between her and Salvato establishes that it was "feasibl[e]" for her to do so, *Penley*, 605 F.3d at 850. Miley had no reason to believe Salvato was a danger to the general public, *id.*, and if Miley's fear was that Salvato would escape, her use of deadly force was clearly unreasonable, *Garner*, 471 U.S. at 11–12, 105 S. Ct. at 1701–02.

To be sure, Salvato "resisted arrest," *Oliver*, 586 F.3d at 905, and struck the officers multiples times, but our en banc decision in *Gilmere v. City of Atlanta, Georgia* is instructive. 774 F.2d 1495 (11th Cir. 1985) (en banc). In *Gilmere*, the plaintiff was driving while intoxicated when he had a near collision with a van, and he then got into an argument with the driver of the van. *Id.* at 1496. The driver called the police and reported that the plaintiff had threatened him with a gun. *Id.* Police officers arrived at the plaintiff's home and ordered him to their car for questioning. *Id.* at 1496–97. The plaintiff "initially put up some resistance by attempting to flee and then flailing his arms about, but these efforts were ineffectual because of his drunken condition." *Id.* at 1497. The officers began escorting him out by force and "beat[] him about the head." *Id.* As they neared the patrol car, the plaintiff "broke free of their hold. During the ensuing scuffle, [one of the officers] shot [the plaintiff] in the stomach and killed him." *Id.* We held that the use of deadly force was not justified. *Id.* at 1502. To be sure, in *Gilmere*, the

13

plaintiff was "small," "intoxicated," and he posed little threat to the officers. *Id*. But the officer shot the plaintiff *during* the scuffle, not as he was retreating. *Id*. And the crime the police officers were investigating—the plaintiff's use of a firearm to threaten the van driver—was far more serious than Salvato's alleged "yelling and cussing."

Federal law clearly established that Miley's actions were unreasonable. Using deadly force, without warning, on an unarmed, retreating suspect is excessive. *See Garner*, 471 U.S. 1, 105 S. Ct. 1694. And although "officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours[] with materially identical facts, . . . so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) (internal quotation marks and citation omitted). Moreover, a "plaintiff can point to a broader, clearly established principle [that] should control the novel facts in [his] situation." *Morton v. Kirkwood*, 707 F.3d 1276, 1282 (11th Cir. 2013) (internal quotation marks and citations omitted). Because the standard for excessive force is clearly established and our precedents and those of the Supreme Court make clear that firing without first warning on a retreating, apparently unarmed suspect is excessive, Miley had "fair warning," *Holloman*, 370 F.3d at 1277, that her actions were unconstitutional.

14

When viewed in the light most favorable to Salvato, the record also establishes that Miley used excessive force when she kicked Salvato's hand after he was already shot, handcuffed, and lying face down in the road. Miley argues that she "merely used her foot to move Salvato's hands away from his pockets, for safety reasons." But there is evidence that she "kicked" Salvato, including her own statements. And it is undisputed that when Miley kicked Salvato, he was handcuffed. Miley testified that she did not consider Salvato a "threat" at this point because he was handcuffed and, even if he could have reached something in his back pocket, he could not have "use[d]" it. Miley failed even to search Salvato's back pockets. On these facts, "the nature and quality of the intrusion on the individual's Fourth Amendment interest" in not being kicked outweighed "the countervailing governmental interest[] at stake." *Oliver*, 586 F.3d at 905 (internal quotation marks and citation omitted).

### 2. Miley Is Not Entitled to Qualified Immunity with Respect to Her Failure to Intervene when Brown Used Excessive Force.

Salvato's estate argues that Miley is also liable for her failure to intervene when Brown repeatedly discharged his Taser into Salvato, and we agree. "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for h[er] nonfeasance." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985). Miley does not contest that Brown's use of force was unreasonable. *See*

15

*Oliver*, 586 F.3d at 906 (holding that the repeated discharge of a Taser into a suspect who is incapacitated is excessive). Because the record, viewed in the light most favorable to Salvato, establishes that Miley was "in a position to intervene," *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998), but failed to do so, the district court did not err when it denied her qualified immunity.

Miley argues that she had "just gone through a traumatic event" and was not completely aware of what Brown was doing, but a jury could reasonably infer otherwise. After the "traumatic event," Miley called for medical assistance, retrieved her flashlight from the grass, and took Brown's handcuffs to restrain Salvato. And after handcuffing Salvato, she at one point kicked his hand to keep him from reaching into his back pockets. Miley testified that she was capable of telling Brown to stop discharging the Taser. And the video evidence tends to prove that Miley was not "dazed" or unaware of her surroundings. Based on this evidence, a jury could find that Miley was "in a position to intervene," *Ensley*, 142 F.3d at 1407, when Brown used excessive force against Salvato, but she "fail[ed] to take reasonable steps to protect" him, *Fundiller*, 777 F.2d at 1442.

### B. The District Court Erred when It Failed to Grant the Sheriff Judgment as a Matter of Law on the Claim of Excessive Force.

The sheriff argues that the district court erred when it denied his motions for judgment as a matter of law. The sheriff argues that the failure to investigate a

single incident, of which the sheriff was unaware until after-the-fact, cannot ratify a constitutional violation. We agree.

Anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Although the sheriff did not use excessive force against Salvato, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988). And "[f]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." *Owens v. Fulton Cnty.*, 877 F.2d 947, 951 n. 5 (11th Cir. 1989).

Salvato's estate argues that "the Sheriff should be liable because he ratified Miley's use of excessive force in failing to conduct an adequate internal investigation [after] the shooting," but this argument fails. The sheriff must "cause[]," 42 U.S.C. § 1983, the constitutional violation; that is, he must "officially sanction[] or order[]" the action. *Praprotnik*, 485 U.S. at 123, 108 S. Ct. at 924 (internal quotation marks and citation omitted). He cannot be held liable on a *respondeat superior* theory of liability. *Monell v. Dep't of Soc. Servs. of City of*

17

*New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978). The sheriff did not order Miley to shoot Salvato. Salvato's estate presented no evidence of a policy, approved by the sheriff, that led to Miley's use of excessive force. And Salvato's estate fails to present evidence of any "custom" not "approv[ed] through . . . official decisionmaking channels," *id.*, that led to Miley's use of excessive force.

Salvato's estate argues that a failure to investigate a single incident is sufficient to establish that the sheriff ratified Miley's actions, but we disagree. "[W]hen plaintiffs are relying not on a pattern of unconstitutional conduct, but on a single incident, they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), *cert. granted, judgment vacated sub nom. Thomas v. Roberts*, 536 U.S. 953, 122 S. Ct. 2653, (2002), *opinion reinstated*, 323 F.3d 950 (11th Cir. 2003). Only when "the authorized policymakers approve a subordinate's decision and the basis for it" have they "ratifi[ed]" that "decision." *Praprotnik*, 485 U.S. at 127, 108 S. Ct. at 926. The sheriff did not "review" any part of Miley's actions "before they bec[a]me final," *Thomas*, 261 F.3d at 1174, much less "approve" the "decision and the basis for it," *Praprotnik*, 485 U.S. at 127, 108 S. Ct. at 926.

18

In *Thomas*, our Court was faced with a similar argument, and we rejected it. In *Thomas*, an elementary school teacher and a police officer performed unconstitutional searches of a number of students. 261 F.3d at 1163–64. The students sued the school district in addition to the teacher and officer who performed the searches. *Id.* at 1165. The plaintiffs argued that the investigation into the searches was inadequate, and that by clearing everyone of any wrongdoing, the district had "ratifi[ed]" the unconstitutional searches. *Id*. at 1174. But we explained that "a local government may be held liable for a constitutional tort when policymakers have had the opportunity to review subordinates' decisions *before* they become final." *Id.* (emphasis added). "Because the [d]istrict had no opportunity to ratify the decision to search the children before the searches occurred," the plaintiffs' argument was "misplaced." *Id*. at 1174–75. We explained that a "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a[n] [unconstitutional] 'custom'. . . that can subject the government to liability." *Id.* at 1174 n.12 (alterations in original) (quoting *Fundiller*, 777 F.2d at 1443). But where the plaintiffs rely on a "single incident," *id.*, the official must have had an "opportunity to review" the subordinate's decision "before [it] become[s] final," *id*. at 1174.

19

Salvato's estate relies on decisions that are inapposite. For instance, it cites *Pembaur v. City of Cincinnati*, where the Supreme Court stated that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," 475 U.S. 469, 480, 106 S.Ct. 1292, 1298 (1986). But in *Pembaur*, the "single decision" was the decision of a prosecutor to order officers to "forcibly enter[]" the plaintiff's medical clinic. *Id.* at 484, 106 S. Ct. at 1300. No party contests that an action that "the municipality has officially . . . ordered" can give rise to liability under section 1983. *Id.* at 480, 106 S. Ct. at 1298. But "municipal liability is limited to action for which the municipality is actually responsible," *id.* at 479, 106 S. Ct. at 1298, and a single failure to investigate an incident cannot have caused that incident. Salvato's estate also cites our decision in *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989), but that decision provides no help to its position, either. In *Mandel*, the plaintiff was a prisoner who was repeatedly denied medical treatment by a physician's assistant. *Id.* at 785–87. We held that the county was liable for the physician assistant's deliberate indifference, but the physician's assistant was the "final policymaking authority with respect to medical decisions at the . . . prison." *Id.* at 793. We did not base our holding on a county official's one-time failure to investigate the deliberate indifference.

Salvato's estate also argues that "[n]umerous courts have recognized *post-event* evidence of a police department's lack of proper internal investigation of an

excessive force incident tends to show the customs and policy that were in effect *prior* to the excessive force incident," but this argument is irrelevant. To be sure, "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989). But "[t]he inferences to be made from these [post-event] facts merely lend weight" to a finding that there was a policy "behind the actions which led to" the constitutional violation. *Kibbe v. City of Springfield*, 777 F.2d 801, 809 (1st Cir. 1985). Again, no party contests that a "persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct." *Thomas*, 261 F.3d at 1174 n.12. But an isolated incident is, by definition, not a "persistent failure." *Id*.

Finally, Salvato's estate cites decisions of the Sixth Circuit that it asserts hold that a single failure to investigate is sufficient to establish liability. *See Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985) (holding a sheriff liable under section 1983 for failing to investigate the beating of a prisoner); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989) (holding sheriff liable under section 1983 for instituting a policy of deliberate indifference to medical needs of physically disabled prisoners because the "Sheriff failed to supervise his employees adequately when he knew or should have known of the danger [to] inmates . . . [and] the Sheriff failed to investigate this incident and punish those

responsible, in effect ratifying their actions"). Salvato also cites *Kimbrough v. City of Cocoa*, a district court decision from our Circuit that relied on *Marchese* to rule that a "jury could find that the City was aware of the actions taken by its officers and their justifications, and that its failure to inquire any further or reprimand any of the Officers, shows that the City sanctioned not only their actions, but also the reasons behind those actions." No. 6:05-CV-471, 2006 WL 3335066, at *8 (M.D. Fla. Nov. 16, 2006).

These decisions are unpersuasive for three reasons. First, it is not clear that the Sixth Circuit held that a single failure to investigate was sufficient for liability, as both decisions involved greater misconduct than a single failure to investigate. *See Marchese*, 758 F.2d at 187–88 ("Not only do the facts show that there was official toleration, (if not complicity in instigation) of the midnight assault on the part of the command officers on duty at the station house that night; but there was also subsequent concealment followed by a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself."); *Leach* 891 F.2d at 1248 ("[T]he district court[] f[ound] . . . deliberate indifference by the Sheriff in that at least 14 other paraplegics had received similar deplorable treatment."). Second, *Marchese* was decided before the Supreme Court issued its decision in *Praprotnik*, which clarified the requirements for municipal liability under section 1983. Third, even if the Sixth Circuit decisions were as broad as Salvato's estate

asserts, those decisions and the decision of the district court in *Kimbrough* are unpersuasive for the reasons given above.

Because we hold that the sheriff cannot be held liable under section 1983 for a single failure to investigate a constitutional violation, we need not reach the sheriff's alternative arguments. And as a final note, we decline to review the sheriff's argument that there was insufficient evidence to hold him liable for wrongful death under Florida law because he did not make this argument before the district court.

## IV.    CONCLUSION

We **AFFIRM** the denial of summary judgment in favor of Miley, and we **REVERSE** the denial of the sheriff's motion for judgment as a matter of law and **RENDER** judgment in his favor on the claim of excessive force.