[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12239
Non-Argument Calendar
_____

D.C. Docket No. 0:14-cv-61303-RLR

ABEL MARTINEZ,

Plaintiff–Appellant,

versus

CITY OF PEMBROKE PINES,
OFFICER KEVIN KING, individually,

Defendants–Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 21, 2016)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff appeals the district court's order granting summary judgment on his federal excessive force and state battery and negligence claims. Defendant Kevin King, a police officer for the City of Pembroke Pines, shot and injured Plaintiff while attempting to take him into custody. Plaintiff subsequently brought this action, asserting a § 1983 excessive force claim against King in his individual capacity and state battery and negligence claims against the City. The district court granted summary judgment to Defendants on all of Plaintiff's claims. Viewing the evidence in the light most favorable to Plaintiff, we agree with the district court that summary judgment is warranted and thus **AFFIRM** the district court's order.

## BACKGROUND

### I.    Factual Background

Early on the morning of June 10, 2010, Plaintiff's girlfriend Yanet Hernandez called 911 to report that Plaintiff was unresponsive and was making strange noises, turning blue, and foaming at the mouth. The paramedics who responded to the call went to Plaintiff's house and met with Hernandez, who primarily spoke Spanish. They were directed to a bedroom at the back of the house where they found Plaintiff lying in his bed and starting to wake up.

Pembroke Pines police officer Kevin King, responding to a police medical emergency dispatch, arrived at the house a few minutes after the paramedics. The

police dispatch did not indicate that any criminal conduct had occurred, and King had no reason to suspect that a crime was in progress. When he arrived at the house, King heard yelling and saw paramedics standing in the doorway of a bedroom. King went to the bedroom, where he found Plaintiff pacing around the room, waving his arms, and yelling in Spanish. He noticed that Plaintiff's eyes were dilated and that he had a white crusty substance around his lips. Hernandez was in the room, holding an infant and speaking to Plaintiff in Spanish.

Unbeknownst to the paramedics or to King, Plaintiff was at the time of their arrival in a postictal state following a convulsive seizure. An individual in a postictal state is not fully conscious or aware of his actions, and may be aggressive and violent. Observing that something was "not right" with Plaintiff, and for their own safety, the paramedics left the room when King arrived. They also persuaded Hernandez to leave the room with the infant she was holding.

King subsequently was alone with Plaintiff in the bedroom for three to four minutes. Plaintiff was not physically aggressive during this time, but he continued to pace, wave his hands, and speak loudly in Spanish. Plaintiff called out for his mother and for his dead grandmother in Cuba. He also began opening drawers as if he were looking for something. He did not respond to King's commands in Spanish to relax ("tranquilo") and sit down ("sientese").

3

Pembroke Pines police officer Michelle Fanelli subsequently arrived at the house in response to a call for backup, and she joined King in the bedroom with Plaintiff. When Fanelli entered the bedroom, she noticed that Plaintiff was speaking in Spanish. She radioed for a Spanish speaking officer to assist, and was told that one was on the way. Then she watched as Plaintiff continued to pace the room while King spoke to him in a soft voice, trying to convince him to calm down.

About a minute after Fanelli arrived, Plaintiff leaned into the bedroom closet and started moving items, again as if he were looking for something. The officers thought it was unsafe to allow Plaintiff to search through the closet, and they gently guided him out of it. Plaintiff offered no resistance. But by this time, King had determined that Plaintiff was suffering from some kind of psychological problem and that he should be taken into custody, both to ensure officer safety and for examination under Florida's Baker Act.[1]

In an attempt to secure Plaintiff for the above purpose, King approached him from behind and attached a handcuff to his right wrist. Plaintiff immediately

---

[1] Florida's Baker Act requires a police officer to "take a person who appears to meet the criteria for involuntary examination into custody and deliver the person or have him or her delivered to the nearest receiving facility for examination." Fla. Stat. § 394.463(2)(a)(2). The criteria is met if: (1) there is reason to believe the person has a mental illness, (2) because of his mental illness, the person either has refused voluntary examination or is unable to determine for himself whether examination is necessary, and (3) without care or treatment, there is a "real and present threat of substantial harm" to the person's well-being or a "substantial likelihood . . . the person will cause serious bodily harm" to himself or others. Fla. Stat. § 394.463(1).

4

began to struggle, flailing his arms such that King was unable to attach the other handcuff. Plaintiff did not punch King, but he repeatedly swung his arms, with the loose handcuffs attached to one wrist, in the direction of King's head. King did not see the handcuffs make contact, but he felt himself being struck hard on the head several times with what he thought at the time was Plaintiff's fist.

Fanelli fired her taser at Plaintiff in an attempt to bring him under control. Plaintiff momentarily fell to the floor, but he was back on his feet and struggling with King within a few seconds. Fanelli fired her taser at Plaintiff again, and then grabbed Plaintiff and pushed him to the ground. King and Fanelli got on top of Plaintiff and attempted to restrain him, but Plaintiff was able to free himself from both officers and run out of the bedroom.

The officers pursued Plaintiff through the bedroom and to the front door of the house, where they saw him handling the lock. They stood about ten feet away from Plaintiff with their guns drawn, gesturing and verbally ordering Plaintiff to get to the ground. Plaintiff ignored their commands and repeatedly shook his head "no." It was at this point that King first realized he was injured and bleeding profusely from his head.

Plaintiff continued to ignore the commands given by the officers, and ran from the front door to the kitchen. Once he was in the kitchen, Plaintiff again started looking around as if he were trying to find something. Although Plaintiff

did not open any drawers or grab anything, he was touching and trying to remove the handcuffs attached to his wrist. King now saw that Plaintiff was covered in blood, which King believed to be from King's own head injury. King also noticed the loose handcuffs hanging from Plaintiff's wrist, and concluded that he was bleeding because Plaintiff had hit him in the head or face with them.

The officers, who were still about ten to twelve feet away from Plaintiff, continued ordering him to get down on the ground. Suddenly and without warning, Plaintiff took two steps toward King. When Plaintiff was within a few seconds of reaching King and as he was advancing, King fired one shot that hit Plaintiff in the stomach. King did not specifically warn Plaintiff that he was going to shoot, but Fanelli ordered Plaintiff to get down on the ground immediately before King fired. King testified that he fired because he feared serious injury or even death at the hands of Plaintiff, who had already injured him and who was rapidly moving toward him with loose handcuffs attached to his wrist.

After Plaintiff was shot, Fanelli opened the front door, which Plaintiff had locked, and allowed additional officers who had been called for back-up to enter the house. Those officers noted that Plaintiff had loose handcuffs attached to his wrist, and gave verbal commands in Spanish for Plaintiff to calm down and stay back. Although Plaintiff had been shot, and also tased several times, he was unresponsive to the commands and charged at one of the officers. Plaintiff was

6

tased again, but he remained on his feet and continued resisting.  Eventually Plaintiff slipped on the floor, and five or six officers were able to restrain him within about a minute.

Both Plaintiff and King were treated briefly on the scene and then taken to the hospital for further treatment.   King received eight staples to close his head wound.  Plaintiff was criminally prosecuted in Broward County Circuit Court on charges of battery on a law enforcement officer and resisting an officer with violence.  He ultimately was found not guilty on all charges.

## II.   Procedural History

Plaintiff subsequently filed this action asserting a § 1983 excessive force claim against King and state battery and negligence claims against the City.[2] Defendants filed a motion for summary judgment on all of Plaintiff's claims, which the district court granted.  The court concluded that King was entitled to qualified immunity on the excessive force claim because his use of force was reasonable under the circumstances and thus lawful under the Fourth Amendment. As King's use of force was lawful, the court held that it did not constitute a battery and could not be the basis of a negligence claim against the City.

---

[2]  Plaintiff initially asserted additional claims against King and the City, as well as § 1983 claims against Fanelli and the Pembroke Pines police chief.  Those claims were omitted from Plaintiff's Amended Complaint, and are not at issue in this appeal.

## DISCUSSION

### I.    Standard of Review

We review a district court's order granting summary judgment de novo. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014).  In conducting our review, we construe the evidence and draw all inferences in favor of the non-moving party, in this case Plaintiff.  *Id.*  "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).

Specifically with regard to qualified immunity, we acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case."  *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (citation and quotation marks omitted).  Nevertheless, we view the facts from Plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove" but rather whether "certain given facts" demonstrate a violation of clearly established law.  *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).  *See also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (noting "the importance of drawing inferences in favor of the nonmovant" in the qualified immunity context).

8

## II.     <u>Plaintiff's Excessive Force Claim Against King</u>

The district court held that King was entitled to qualified immunity on Plaintiff's excessive force claim.  "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  Plaintiff's excessive force claim arises out of his shooting by King.[3]  It is undisputed that King was engaged in a discretionary duty when he shot Plaintiff.  It is thus Plaintiff's burden to show that qualified immunity is not appropriate.  *Id.* at 995.

To meet this burden, Plaintiff must satisfy a two-part test.  *See McCullough*, 559 F.3d at 1205.  First, he must show that King's conduct violated a constitutional right.  *Id.*  Assuming a violation, Plaintiff must show the constitutional right was clearly established at the time of the incident.  *Id.*  Viewing the evidence in the light most favorable to Plaintiff, neither prong is satisfied here.

---

[3]  Plaintiff argues in his appellate brief that King also violated his Fourth Amendment rights by "pushing" him out of the closet and attempting to handcuff him.  Plaintiff did not raise this argument in the district court, and in fact he acknowledged in his summary judgment briefing that King's "pre-shooting actions d[id] not rise to the level of a constitutional violation."  Accordingly, we will not address the argument on appeal.  *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1125 (11th Cir. 2014) ("We have said repeatedly that we will not consider an issue raised for the first time on appeal.").

A.    Constitutional Violation

Plaintiff's excessive force claim is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). The reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and quotation marks omitted). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. *Id.* We view the circumstances "from the perspective of a reasonable officer on the scene." *Id.* (citation and quotation marks omitted). And we allow for the fact that officers are often required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.* (citation and quotation marks omitted).

It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a person who poses an imminent threat of serious physical harm to the officer or others. *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005). *See also McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (finding no constitutional violation where an officer shot a suspect

he "could reasonably perceive" as posing "an imminent threat of violence to the officer and other bystanders").  The record unequivocally supports King's claim that Plaintiff posed such a threat when he was shot.  Plaintiff conceded below that King was authorized to take him into custody.[4]  It is undisputed that Plaintiff resisted King's attempt to restrain him for this purpose, such that King was only able to attach one end of a pair of handcuffs to Plaintiff's wrist.  Plaintiff then flailed and swung his arms at King's head, causing a head wound that later required eight staples to close.

During his subsequent struggle with the officers, Plaintiff was unresponsive to all commands and gestures, impervious to the taser, and otherwise unable to be restrained.  A few moments before he shot Plaintiff, King realized that he was bleeding profusely from a head wound and that his injury likely was caused by Plaintiff hitting him with the loose handcuffs attached to Plaintiff's wrist.  In the seconds immediately preceding the shooting, Plaintiff continued to ignore the officers' commands and, with the handcuffs still attached to his wrist, he suddenly advanced to within a few feet of King.

Given the above undisputed facts, there simply is no question that a reasonable officer could—and likely would—have perceived Plaintiff as posing an

---

[4]  Plaintiff now argues otherwise, but again this argument was not raised in the district court.  We also note that the undisputed evidence—including testimony from Plaintiff's police practices expert and treating physician—shows that King was so authorized.

11

imminent threat of serious physical harm.  Plaintiff claims there was no indication he intended to harm King when he advanced toward him, but it was reasonable for King to conclude otherwise.  King was not required to try and divine Plaintiff's subjective intent.  *See McCormick*, 333 F.3d at 1246 (noting that the plaintiff's "subjective perceptions have little bearing on how a reasonable officer" would have viewed a situation).  Nor was he required to wait and see what might happen if he allowed Plaintiff to advance further.  *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect").  His decision to use deadly force was reasonable under the circumstances, and thus in compliance with the Fourth Amendment.

B.    Clearly Established Law

Even assuming a constitutional violation, King is entitled to qualified immunity unless Plaintiff can show that his Fourth Amendment rights were "clearly established" at the time of the shooting.  *Plumhoff*, 134 S. Ct. at 2023.  To be clearly established, the contours of a right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Id.*  "The salient question is whether the state of the law at the time of an incident provided fair warning to the defendant[] that [his] alleged conduct was

unconstitutional." *Tolan*, 134 S. Ct. at 1866 (quotation marks omitted and alterations adopted).

Fair warning is commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *See Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012). However, a case directly on point is not required as long as "existing precedent" placed the "constitutional question beyond debate." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (citation and quotation marks omitted). *See also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("judicial precedent with materially identical facts is not essential for the law to be clearly established").

As suggested by the above discussion, there is no case law that would have put King on notice that his conduct was unlawful. To the contrary, he would have concluded from the most closely analogous case that his use of deadly force was reasonable and thus constitutional given the situation he faced. *See McCormick*, 333 F.3d at 1246. In *McCormick*, a criminal suspect who had not been deterred by pepper spray, and who continued to ignore all commands, was rapidly advancing toward the defendant officer with a raised walking stick. As the suspect advanced, the officer tripped over a parking stone such that he became vulnerable to attack. The suspect then charged toward the officer, who fired his weapon. We held that the use of deadly force was constitutional under the circumstances because the

13

officer reasonably could have perceived that the suspect posed an imminent and serious threat.  *Id.*  The same principal applies here.

Plaintiff cites *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) and *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) in support of his excessive force claim.  *Salvato* was issued after Plaintiff's shooting and so could not have provided fair warning.  Moreover, the facts in both *Salvato* and *Gilmere* are too different from those in this case to put King on notice that his actions were unlawful.  In *Salvato*, we held that an officer used excessive force when she shot a suspect who had formerly resisted arrest, but who was retreating, unarmed, and outside of striking distance at the time of the shooting.  *Salvato*, 790 F.3d at 1293.  In *Gilmere*, we held that an officer used excessive force by shooting a suspect who was engaged in a scuffle with the police, but who could not have seemed very dangerous given his "small size, intoxicated state, and lack of a weapon."  *Gilmere*, 774 F.2d at 1502.

Unlike the suspects in either *Salvato* or *Gilmere*, Plaintiff was armed with a pair of loose handcuffs, which he had already used to inflict a head injury on King, when he was shot.  He had proven himself to be impervious to the taser and impossible to be restrained, and he was advancing quickly and within a few seconds of reaching King.  Given those material distinctions, neither *Salvato* nor

14

*Gilmere* is sufficient to meet Plaintiff's burden to show that his allegedly violated rights were clearly established.

### III.    Plaintiff's State Claims

Plaintiff concedes that in order to prevail on his state claims against the City, he must first show that he was injured by some wrongful act on the part of King. In his battery claim, Plaintiff seeks to hold the City liable on a respondeat superior theory for his shooting by King. The City cannot be held liable on such a theory unless the shooting actually was a battery. Under Florida law, force used by a police officer during the course of a lawful arrest only constitutes a battery if it was clearly excessive, an inquiry governed by the reasonableness analysis employed above. *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. DCA 1996). Our conclusion that King's use of force was reasonable under the circumstances thus precludes Plaintiff's battery claim against the City.

In support of his negligence claim, Plaintiff alleges that the City negligently failed to implement adequate policies and training to minimize the risk that police officers will use "unnecessary and unreasonable force" in their interaction with people "in a medical or mental health crisis." Again, Plaintiff acknowledges that he must show King acted wrongfully during his encounter with Plaintiff to recover on this theory. That is, he must show that King's use of force was unreasonable under the circumstances. Plaintiff did not argue below, and he does not argue on

appeal, any theory under which the City could be liable for negligence assuming King's use of force was lawful.  Thus, as with Plaintiff's battery claim, our conclusion that King's use of force was reasonable bars Plaintiff's recovery.

## CONCLUSION

For the reasons discussed above, we agree with the district court that King is entitled to qualified immunity on Plaintiff's excessive force claim, and that there is no basis for imposing liability on the City under state law.  Accordingly, we **AFFIRM** the order of the district court granting summary judgment.