[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11403
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-03022-SCB-AEP

VICKI SEXTON,
as the Personal Representative of
the Estate of Ronald Wesley Sexton,
BRANDY WALLACE,
as the Personal Representative of
the Estate of Ronald Wesley Sexton,

Plaintiffs-Appellees,

versus

NICOLO MANGIARACINA,
Officer, individually and as a member of St. Petersburg Police Department,
JUSTIN MORALES,
Officer, individually and as a member of St. Petersburg Police Department,
MICHAEL ROMANO,
Officer, individually and as a member of St. Petersburg Police Department,
ANTHONY HOLLOWAY,
Chief, St. Petersburg Police Department Chief,
CITY OF ST. PETERSBURG,
d.b.a. City of St. Petersburg Police Department,

Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
———————————————

(September 16, 2016)

Before ED CARNES, Chief Judge, HULL and MARCUS, Circuit Judges.

PER CURIAM:

In the early hours of September 2, 2013 Andrea Robinson called 911 and reported that her next door neighbor, Ronald Sexton, had gotten into a verbal argument with her boyfriend, Cedric Warren. Warren also got on the phone with the 911 dispatcher and said that Sexton had "shown" him a handgun but had not pointed it at him. Warren said that Sexton's wife or girlfriend came over and told him that Sexton had been drinking. Robinson then got on the phone with the dispatcher and said she could see Sexton standing "right off his walkway" in front of the door to his house, and he was talking on his cell phone. Robinson said she saw Sexton "load" the gun and put it in his right pocket. The dispatcher relayed that information to the officers who were on their way to the scene.

Officers Nicolo Mangiaracina, Justin Morales, and Michael Romano, along with other St. Petersburg Police Department officers, arrived on the scene to see Sexton, still talking on his cell phone, and his son, Joshua, then ten years old, on

2

their lighted front porch. When Joshua saw the officers approach, he ran into the house. The parties dispute what happened next, and they offer different accounts of the events that led to the fatal shooting of Sexton. At the summary judgment stage, we must view the evidence in the light most favorable to the non-moving party. See Morton v. Kirkwood, 707 F.3d 1276, 1279 (11th Cir. 2013). Those facts come from Joshua's description of what he saw, presented in the form of an affidavit the plaintiffs submitted as part of their opposition to summary judgment.

That affidavit explains that when Joshua ran inside he went to a window that looks out onto the porch, where he watched his father take the gun out of his pocket and kick it off of the porch before the police made contact with him. After he saw his father kick the gun away, Joshua heard the officers yell at his father to drop the gun, and he watched his father drop the cell phone, the only thing in his hands. The officers then ordered Sexton to get on the ground. Sexton placed one knee on the ground and was in the process of placing his other knee down when Officers Mangiaracina, Morales, and Romano shot and killed him.

In the hours following the shooting, various law enforcement officials interviewed Joshua three separate times. During his first and second interviews, one of which he gave under oath, Joshua stated that he watched as the officers shot his unarmed father, who was complying with their instructions. In the third

3

interview, Joshua said that he saw his father drop the gun and kick it off the porch, but that he did not actually see what happened after that because he left the window to go tell his mother what was happening.

The plaintiffs, who are the personal representatives of Sexton's estate, brought this lawsuit against the officers under 42 U.S.C. § 1983 alleging that the officers used excessive force in violation of the Fourth Amendment.  They also asserted state law wrongful death claims against the officers and Chief Anthony Holloway and state law battery claims against the officers and the city of St. Petersburg.  The defendants moved for summary judgment, with the officers contending that they were entitled to qualified immunity on the § 1983 claims, and the officers, Chief Holloway, and the city contending that they were entitled to summary judgment on the state law claims on the merits.  The district court denied that motion, and they now appeal.

While the notice of appeal includes Chief Holloway and the city as appellants, indicating that they are appealing the denial of summary judgment on the state law claims, the parties have not briefed the denial of summary judgment on those claims.  It is questionable if we have pendent appellate jurisdiction over those claims.  See Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 44–51, 115 S. Ct. 1203, 1209–12 (1995).  Even if we do, we decline to consider them because

4

the defendants have abandoned them by failing to brief them. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). We have interlocutory appellate jurisdiction over the denial of the defense of qualified immunity as to the § 1983 claims against the officers. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985) ("[W]e hold that a district court's denial of a claim of qualified immunity . . . is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."). "We review de novo a district court's denial of summary judgment based on qualified immunity, applying the same legal standards that governed the district court." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

As we have mentioned, one of the main pieces of evidence upon which the plaintiffs relied was Joshua's affidavit, which set forth facts that the district court considered when ruling on summary judgment. The officers contend that the district court should not have considered Joshua's statements in his affidavit because other evidence in the record discredits his version of events, especially his observations  based on having watched the shooting itself. The officers point to

5

their deposition testimony and an earlier statement Joshua had given about the shooting as discrediting his affidavit.  At the summary judgment stage, we view the facts "in the light most favorable to the moving party," but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Fed. R. Civ. P. 56(c)).  We may not give credence to facts that are patently contradicted by the record.  See, e.g., id.  ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  But that contradiction must be so "blatantly inconsistent" or "incredible as a matter of law" that the facts "could not have possibly been observed" or the testimony is "contrary to the laws of nature."  Feliciano, 707 F.3d at 1253.

On four separate occasions, Joshua has given his account of what he saw the night his father died.  In his first two interviews Joshua said that he watched the officers shoot his unarmed and compliant father while he was attempting to kneel on the ground.  In his third interview, he said that he saw the events leading up to the shooting but he did not see the shooting itself.[1]  In his fourth account — given

---

[1] All three of these interviews were conducted in the early morning hours following the shooting. The first was conducted by a detective, the second was conducted by an assistant state's attorney, and the third was conducted by internal affairs investigators.

6

in his affidavit — Joshua again said that he saw the officers shoot Sexton, who was unarmed and obeying their commands. Joshua's affidavit contradicts his earlier statement from the third interview that he was not looking out the window when the officers shot Sexton. The affidavit is also inconsistent with the officers' account of what happened: that Sexton, who had initially been compliant with their orders, pulled the gun from his right pocket and pointed it at Officer Mangiaracina, and that only then did the officers shoot Sexton. Joshua's affidavit testimony that he saw the shooting, however, is supported by statements he made during the first two interviews. Only after giving those two statements, consistently saying that he watched as the officers shot his unarmed and compliant father, did Joshua, in his third interview (the one conducted by internal affairs investigators), say that he was not looking out the window when the shooting occurred.

Joshua's statements, while inconsistent, do not recount "facts that could not have possibly been observed or events that are contrary to the laws of nature." Id. While his affidavit stating that he saw the shooting contradicts one of his earlier statements that he did not, those inconsistencies present a credibility issue, which is something that we cannot decide at the summary judgment stage. See Moorman v. UnumProvident Corp., 464 F.3d 1260, 1266 n.1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible.").

7

In light of Joshua's affidavit and taking the facts in the light most favorable to the plaintiffs, we turn to the issue of whether the officers are entitled to qualified immunity.  The purpose of qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks and citation omitted).

To obtain qualified immunity, the defendants must show that they were acting within their discretionary duty. Mobley v. Palm Beach Cty. Sheriff Dep't, 783 F.3d 1347, 1352 (11th Cir. 2015).  That point is undisputed here.  To overcome qualified immunity, the plaintiffs must establish (1) that the defendants violated Sexton's constitutional rights and (2) that "the law clearly established those rights at the time of the alleged misconduct." Id. at 1352–53 (quotation marks omitted).  "We may address those two inquiries in either order." Id.

The plaintiffs' excessive force claim arises under the Fourth Amendment, which prohibits a use of force that is "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989) (quotation marks omitted).  Stated another way, "[o]fficers may use force that is 'necessary in the situation at hand.'" Fils v.

8

City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) (quoting Lee, 284 F.3d at 1197).

Under the facts as we must take them here, the officers' use of deadly force was neither necessary nor reasonable. To the contrary, we have held under facts similar to those of this case that an officer cannot use deadly force against a compliant suspect who is not placing others in imminent danger. Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013), is one example. In that case officers encountered a suspect sitting in his car and, when the suspect began to slowly drive the car away he noticed an officer chasing him. Id. at 1279. The suspect heard the officer shout, and he responded by immediately placing his car in park and raising his hands, at which point another officer on the scene shot him seven times. Id. at 1279–80. We held that the officer had violated the suspect's Fourth Amendment rights because he acted unreasonably by "sho[oting] an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger." Id. at 1282; see also Perez v. Suszczynski, 809 F.3d 1213, 1217–19 (11th Cir. 2016) (finding that an officer used excessive force when he shot a suspect who had been thrown to the ground and who was complying with the officers' orders); Salvato v. Miley, 790 F.3d 1286, 1293–94 (11th Cir. 2015) (finding a Fourth Amendment violation where an officer shot a suspect who

9

initially resisted arrest and struck the officer but who had retreated beyond striking distance when the officer shot him without warning); see also Lee, 284 F.3d at 1198 (finding a Fourth Amendment violation where an officer slammed an arrestee's head against her vehicle despite the fact that she posed no threat and no risk of fleeing); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (holding that an officer used excessive force when he ordered his dog to attack a burglary suspect who was complying with the officer's orders).

The officers here had been informed that Sexton had been drinking and had a loaded gun in his pocket. According to the plaintiffs' version of the facts, however, Sexton showed no indication that he was reaching for the gun or otherwise planned to use it. And what we accept as facts at this stage of the proceedings is that Sexton, having dropped his cell phone (the only thing in his hands), attempted to comply with the officers' instructions to get on the ground. As he began to kneel, the officers shot him. While the officers may have reasonably believed that Sexton had a handgun in his pocket, he was complying with their orders and not acting in a manner that a reasonable officer would interpret as posing an immediate threat. To conclude that Sexton reached for the firearm and pointed it at an officer, we would have to credit the officers' version of facts over Joshua's, which we cannot do at summary judgment. The district court

10

did not err in finding that a reasonable jury could conclude that the officers' actions constituted excessive force in violation of the Fourth Amendment.

To overcome a qualified immunity defense, it must have been clearly established at the time that the conduct was a constitutional violation.  "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  Priester, 208 F.3d at 926 (11th Cir. 2000).  However, "although 'officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours[ ] with materially identical facts, . . . so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.'"  Salvato v. Miley, 790 F.3d 1286, 1294 (11th Cir. 2015) (alterations in original) (quoting Holloman ex rel. Hollman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004)).

As noted above, we have more than once held that an officer cannot use deadly force against a suspect who is complying with their orders and not posing an imminent threat.  See Morton, 707 F.3d at 1282; Lee, 284 F.3d at 1198, Priester,

11

208 F.3d at 927.[2] Those cases clearly established the unreasonableness and unlawfulness of the officers' decision to shoot Sexton under what we have taken to be the facts for present purposes, keeping in mind that they may not be the actual facts established at trial.  See Swint v. City of Wadley, Ala., 5 F.3d 1435, 1439 (11th Cir. 1993), overruled on other grounds by Swint v. Chambers Cty. Comm'n, 514 U.S. 35, 115 S. Ct. 1203 (1995).  And this ruling affirming the denial of qualified immunity at summary judgment does not mean that the officers cannot by following proper procedures prevail at trial on qualified immunity grounds.  See Johnson v. Breeden, 280 F.3d 1308, 1317–19 (11th Cir. 2002); Cottrell v. Caldwell, 85 F.3d 1480, 1487–88 (11th Cir. 1996).

   **AFFIRMED.**

---

[2] We issued Perez and Salvato after the officers shot Sexton, and thus we cannot rely on those cases when looking to whether the right was clearly established at the time of the violation.

12