[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11421

_____

JAMES ERIC MCDONOUGH,

                                        Plaintiff-Appellant,

*versus*

CARLOS GARCIA,
GARLAND WRIGHT,
individually,
CITY OF HOMESTEAD,
a political subdivision of the State of Florida,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21986-FAM

_____

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, and ABUDU, Circuit Judges.

GRANT, Circuit Judge, delivered the opinion of the Court, in which WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, LUCK, LAGOA, BRASHER, and ABUDU, Circuit Judges, joined.

ABUDU, Circuit Judge, filed a concurring opinion.


GRANT, Circuit Judge:

James McDonough's trip to the Homestead city council meeting started with a comment and ended with his expulsion. When he returned for the next month's meeting, he learned he had been banned from City Hall. McDonough ended up with a disorderly conduct arrest, as well as a few other charges. He sued, challenging, among other things, his ban from City Hall. When considering that challenge, the first question this Court asked was what kind of public forum the city council meeting was. The second was what legal standard applies in that forum.

These questions seemed simple; they did not turn out to be. Instead, they highlighted an unresolved knot in our precedents that could only be untangled with en banc review. While the Supreme Court's public forum framework has evolved over the last forty years, our own precedents have failed to keep pace. We now take the opportunity to get our house in order, aligning our public forum doctrine with the Court's latest cases. Because the city council meeting here limits participants' speech to a specific subject matter—topics "pertinent to the City"—these meetings are limited public forums, where regulations must be reasonable and viewpoint neutral.

**I.**

We include here only the facts necessary to answer the legal questions before the en banc Court. The City of Homestead, Florida holds monthly city council meetings at its city hall. These meetings are open to the general public, and the council invites speeches of up to three minutes at a time on any matters "pertinent to the City" during the public comment portion of each session. McDonough, a self-styled citizen activist, is a regular. After one of his comments was perceived as a threat, he was removed from the July 2016 meeting.

A month later, planning to attend the August meeting, McDonough arrived at City Hall. This time, a police sergeant was waiting for him. He informed McDonough that because of his behavior at the last meeting, the City had issued what it called a "trespass order." That order banned him from City Hall—including for

city council meetings. McDonough, understandably displeased, asked how he could get the ban lifted. The sergeant's response was that he could "write a letter." To whom, it was not clear, and what the letter should say was equally opaque.

For reasons not relevant to the First Amendment issue we consider here, the sergeant did not stop there, and McDonough's August trip to City Hall ended with an arrest for disorderly conduct. Needless to say, he was also prevented from attending the city council meeting. McDonough skipped the next several meetings too, fearing another arrest. He never did write a letter asking for his ban to be lifted, but starting in December of that year he returned to City Hall without incident and attended a meeting. He resumed his habit of regular attendance after that.

McDonough also made good on an earlier promise to file suit, and raised a variety of claims against the City of Homestead, the sergeant who escorted him out of the July meeting, and other involved officers. Only one issue concerns us here: whether the trespass order and his ban from future city council meetings violated the First Amendment. On that point, the district court found no constitutional error.

A panel of this Court disagreed. *McDonough v. Garcia*, 90 F.4th 1080, 1094 (11th Cir.), *vacated and reh'g en banc granted*, 93 F.4th 1220, 1221 (11th Cir. 2024). After describing the parties' disagreement about the forum type involved, we noted that the "parties' uncertainty reflects the fact that our caselaw does not offer an easy answer." *Id.* at 1092. We came to what we called "the somewhat

uncomfortable conclusion" that our earliest precedent dictated that the city council meeting McDonough attended was a designated public forum. *Id.* at 1087. And that early holding, we said, "was reaffirmed after Supreme Court precedents that pointed to—but did not demand—a different answer." *Id.* The panel then completed the analysis under the designated-public-forum standard, reversing the grant of summary judgment to the City but affirming the sergeant's qualified immunity win. *Id.* at 1094, 1096–97.

Soon enough, the full Court voted to hear this case en banc. We instructed the parties to brief two questions: *first*, "[w]hat kind of public forum are the City of Homestead's city-council meetings," and *second*, "what legal test applies to speech restrictions within that kind of forum?" We now consider those questions.

## II.

We have long understood the commonsense point that the Constitution does not require the government to "grant access to all who wish to exercise their right to free speech," no matter the setting, "without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Disallowing any limits whatsoever in all government spaces would often lead to chaos, and could even keep the government from fulfilling its lawful functions. But that is not a license to evade the First Amendment, which demands a close look when the government restricts speech.

Enter forum analysis, which considers "when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* at 800. The government's ability to impose restrictions on speech varies depending on the nature of the forum. *See Keister v. Bell*, 29 F.4th 1239, 1251 (11th Cir. 2022); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). The Supreme Court has recognized four types: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015). Content restrictions in the first two categories are reviewed under strict scrutiny, while regulations in the latter two survive so long as they are viewpoint neutral and reasonable.

Here, the parties now agree that the City of Homestead's city council meetings qualify as limited public forums. This fit of unanimity, however, obscures the thorny doctrinal history of public forum analysis both here and at the Supreme Court. For that reason, we find it useful to show our work, explaining the public forum framework as it exists today, then considering the Supreme Court's evolution—and our own—on the concept of a limited public forum.

## A.

The Supreme Court first outlined public forum doctrine in *Perry Education Association v. Perry Local Educators' Association*. Synthesizing several decades' worth of First Amendment

jurisprudence, the Court set out three categories and explained that the government's ability to restrict expressive activity would be different in each one.  460 U.S. at 45–46.

The first was the traditional public forum—places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 45 (quotation omitted).  The quintessential examples are streets and parks.  *Id.*  It is no surprise that in this kind of forum the government's ability to restrict speech is highly constrained.  Regulations that depend on the content of speech need to satisfy strict scrutiny, which means they must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end."  *Id.*  As for content-neutral "time, place, and manner" regulations— when, where, and how speech can happen, regardless of the speaker's message—the standard is somewhat looser.  *Id.*  Even so, such rules must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Id.*[1]

---

[1] Those two standards, though similarly worded, are different.  For a time, place, and manner restriction to be "narrowly tailored," it "need not be the least restrictive or least intrusive means of" serving "the government's legitimate, content-neutral interests."  *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989).  Instead, "narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and it does not "burden substantially more

Next in *Perry* was the designated public forum, or "public property which the State has opened for use by the public as a place for expressive activity." *Id.* Examples include "university meeting facilities," "school board meeting[s]," and "municipal theater[s]." *Id.* at 45–46. These forums and others like them need not be held open indefinitely for public speech, the Supreme Court said, but when the government does choose to open a designated public forum, it is bound to respect the same First Amendment standards that apply in traditional public forums. *Id.* at 46.

The third and final category described in *Perry* was the nonpublic forum. This type of forum is, as the name suggests, not really a public forum at all, and includes government property that "is not by tradition or designation a forum for public communication." *Id.* The First Amendment, after all, "does not guarantee access to property simply because it is owned or controlled by the government." *Id.* (quotation omitted). The internal school mail facility at issue in *Perry* was one such nonpublic forum; other examples are mailboxes, military bases, and jails. *Id.*; *see also U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 128–29 (1981); *Greer v. Spock*, 424 U.S. 828, 838 (1976); *Adderley v. Florida*, 385 U.S. 39, 47–48 (1966). For these, the Court said, the state can impose "reasonable" regulations on speech in order to "reserve the

speech than is necessary to further" that interest. *Id.* at 799 (alteration adopted and quotation omitted).

forum for its intended purposes," but only if those restrictions are viewpoint neutral. *Perry*, 460 U.S. at 46.

The Supreme Court followed this tripartite framework without interruption for about a decade, until *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). There, the Court made an important shift—though without saying so—setting out a fourth category, the limited public forum. *Perry* had not recognized a separate category of "limited public forums." It just explained in a footnote that a subset of designated public forums were those "created for a limited purpose such as use by certain groups, or for the discussion of certain subjects." *Perry*, 460 U.S. at 46 n.7 (citations omitted). And it recycled two of its earlier examples of designated public forums as falling within that category: university meeting facilities and school board meetings. *See id.* at 45–46, 46 n.7.

But in *Rosenberger*, the Court moved limited public forums out of the designated public forum bucket. *Rosenberger* explained that in a "limited public forum"—one created "for certain groups or for the discussion of certain topics"—the government could enforce speech restrictions that were "reasonable in light of the purpose served by the forum" and did not discriminate on the basis of viewpoint. 515 U.S. at 829 (quotation omitted). This was the same test the Court had offered before for nonpublic forums. *See Perry*, 460 U.S. at 46.

*Rosenberger* cited two post-*Perry* cases to support this point. *See* 515 U.S. at 829 (citing *Cornelius*, 473 U.S. 788; and *Lamb's Chapel*

*v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)).  But both had outlined the same three-part forum analysis as *Perry*—including a recognition that the stricter standard associated with traditional public forums applied when the government designated a forum for open public expression.[2]  *See Cornelius*, 473 U.S. at 800; *Lamb's Chapel*, 508 U.S. at 390–93.  *Cornelius*, like *Perry*, identified school board meetings and municipal auditoriums as examples of designated public forums.[3]  *Cornelius*, 473 U.S. at 803.  It reiterated that the reasonable-and-viewpoint-neutral test applied for "nonpublic forum[s]."  *See id.* at 806.  *Lamb's Chapel*, for its part, simply quoted *Cornelius* for the same rule.  508 U.S. at 392–93.  Neither established a new category of "limited public forums."

*Rosenberger* thus represented a break from *Perry* and its progeny.  Where *Perry* described limited public forums as a subset of designated public forums, *Rosenberger* said the test applied in limited public forums was the same as the test used in nonpublic forums.  So what probably read as a minor conceptual shift—after all, these categories are often based on a matter of degree—turned out

---

[2] Same with *International Society for Krishna Consciousness, Inc. v. Lee*, which repeated *Perry*'s three-part framework but was not cited in *Rosenberger*.  *See* 505 U.S. 672, 678–79 (1992).

[3] The *Cornelius* dissent, for what it is worth, explicitly used the term "limited public forum" as a synonym for designated public forum, and there is no sign that the majority disagreed with that characterization.  *See Cornelius*, 473 U.S. at 813 (Blackmun, J., dissenting) (citing *Perry*, 460 U.S. at 48).

to have major implications for the analysis courts use and the standards we set.

This doctrinal change came with its own growing pains. Just three years later, the Court appeared to walk back *Rosenberger*'s creation of the limited public forum. In *Arkansas Educational Television Commission v. Forbes*, the Court briefly returned to *Perry*'s three categories: traditional public forums, designated public forums, and nonpublic forums. 523 U.S. 666, 677–78 (1998). The *Forbes* Court described a forum open only to "a particular class of speakers" as a type of designated public forum—consistent with *Perry* but contrary to *Rosenberger*, which called a forum reserved "for certain groups" a limited public forum. *Id.* at 678; *see Perry*, 460 U.S. at 45–46, 46 n.7; *Rosenberger*, 515 U.S. at 829.

But in 2001, *Good News Club v. Milford Central School* cemented *Rosenberger*'s change. 533 U.S. 98. The Supreme Court reaffirmed *Rosenberger*'s shift, applying the reasonable-and-viewpoint-neutral standard to restrictions in a limited public forum. *See id.* at 106–07. The Court maintained its earlier standard for restrictions on speech in traditional or "open" (an apparent synonym for designated) public forums, describing those categories as "subject to stricter scrutiny than are restrictions in a limited public forum." *Id.* at 106. So *Perry*'s early characterization of limited public forums as a specific subset of designated public forums was dead and gone—at least at the Supreme Court.

The characterization of the limited public forum as a category distinct from the designated public forum remains in force at

12                    Opinion of the Court                    22-11421

the Supreme Court. So does the application of the reasonable-and-viewpoint-neutral standard to restrictions on speech within that kind of forum. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009); *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 (2010). And in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the Court described the limited public forum as a category independent from both designated public forums and nonpublic forums. *See* 576 U.S. at 215–16. That leaves, for today, four kinds of forums recognized by the Supreme Court: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum.[4]

## B.

This Circuit's public forum doctrine has also evolved—just not always in tandem with the Supreme Court's. In 1989 we deemed a city commission meeting, which was open for public comment on agenda items, a designated public forum. *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989). Consistent with *Perry*,

---

[4] The Supreme Court has also said at times that there are only three, using the categories of "limited public forum" and "nonpublic forum" interchangeably. *See Christian Legal Soc'y*, 561 U.S. at 679 n.11 (recognizing traditional public forums, designated public forums, and limited public forums); *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (recognizing traditional public forums, designated public forums, and nonpublic forums); *see also Am. Freedom Def. Initiative v. King Cnty.*, 577 U.S. 1202, 1202 (2016) (Thomas, J., dissenting from denial of certiorari) (noting that a "limited public forum" is "also called a nonpublic forum"). Perhaps it is irrelevant if the same test is applied to speech restrictions in either setting. But because the Supreme Court has differentiated, so do we.

we held that content-based restrictions were subject to strict scrutiny in this designated public forum, while content-neutral, time, place, and manner restrictions needed to be "narrowly drawn to achieve a significant governmental interest" and "allow communication through other channels." *Id.* So far so good.

Four years later, we correctly read *Perry* to say that one "kind of designated public forum is the limited public forum." *Crowder v. Hous. Auth. of Atlanta*, 990 F.2d 586, 591 (11th Cir. 1993). We went on to hold that an auditorium in a public housing unit "was a limited public forum" because it was open for a "wide range of expressive activities." *Id.* All remained well because at that time both this Court and the Supreme Court considered limited public forums a type of designated public forum, subject to the same test.

Trouble held off for a little over a decade.[5] In 2004, nine years after *Rosenberger* made clear that restrictions in limited public forums should be evaluated for reasonableness and viewpoint neutrality (and three years after *Good News Club* did the same), this Court held that city council meetings were limited public forums. *Rowe v. City of Cocoa*, 358 F.3d 800, 802 (11th Cir. 2004) (quoting

---

[5] In 2003, sitting en banc, we explained that there were three forum categories: traditional public forum, designated public forum, and nonpublic forum. *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1306 n.9 (11th Cir. 2003) (en banc). We wrote that strict scrutiny applied to content-based restrictions in traditional and designated public forums, while the reasonable-and-viewpoint-neutral test applied to restrictions in nonpublic forums. *Id.* at 1306–07. We made no mention of the limited public forum.

*Crowder*, 990 F.2d at 591).  No problem there.  But *Rowe* applied the designated forum test rather than the nonpublic forum test to this allegedly limited forum, saying that content-neutral restrictions on the time, place, and manner of speech "must be narrowly tailored to serve a significant government interest." *Id.* at 802–03 (quotation omitted).[6]  This was consistent with *Perry*, as well as *Jones* and *Crowder*, but not with the more recent *Rosenberger* and *Good News Club*, which would have reviewed restrictions in a limited public forum only for viewpoint neutrality and reasonableness in light of the forum's purpose.  In other words, our treatment of limited public forums diverged from that of the Supreme Court.

By 2011, we had partially corrected course.  In *Bloedorn v. Grube*, a case about a non-student seeking to preach on a public university's campus, we articulated the difference between public, designated, and limited forums and described the tests applicable to each consistent with the Supreme Court's latest explanation as laid out in *Good News Club*, *Pleasant Grove City*, and *Christian Legal Society*.  *See* 631 F.3d 1218, 1225–26, 1230–32 (11th Cir. 2011).  The university's sidewalks, pedestrian mall, and rotunda were limited public forums because they were limited to use only by university community members, while the Free Speech Area open to outside speakers was a designated public forum.  *Id.* at 1232–34.  We concluded that the university's ban on outside speakers in the limited

---

[6] *Rowe* did, we note, characterize the regulations that it approved as "reasonable and viewpoint neutral" in its concluding paragraph, despite having applied a different test in the analysis.  *Rowe*, 358 F.3d at 804.

public forums reserved for university members was a reasonable, viewpoint-neutral restriction. *See id.* at 1235. And the requirement that outside speakers seek a permit to access the Free Speech Area was upheld as a content-neutral, time, place, and manner restriction narrowly tailored to the university's significant interests in regulating competing uses of the space and maintaining campus safety, leaving open ample alternative channels for speech. *See id.* at 1236–42. While that was all consistent with *Good News Club*, *Bloedorn* did not cite or explain away *Rowe*, which came after *Good News Club* but still applied our earlier approach for limited public forums, grouping them with designated public forums rather than nonpublic.

So, in the post-*Good News Club* era, this Court has had two inconsistent but concurrent approaches to analyzing limited public forums: *Rowe*, which requires content-neutral restrictions in a limited public forum to be narrowly tailored to a significant governmental interest (and implicitly requires strict scrutiny for content-based restrictions), and *Bloedorn*, which reviews all restrictions only for viewpoint-neutrality and reasonableness. Compounding the confusion, *Jones*—our Circuit's earliest case applying forum analysis to a city commission meeting—treated that meeting as a designated, rather than a limited, public forum, and accordingly reviewed a content-neutral decision for narrow tailoring to a significant governmental interest. *Jones*, 888 F.2d at 1331. Between *Jones*, *Rowe*, and *Bloedorn*, then, we had three combinations of labels and tests that could apply here: *Jones*, a designated public forum with heightened scrutiny; *Rowe*, a limited public forum with heightened

16                    Opinion of the Court                    22-11421

scrutiny; and *Bloedorn*, a limited public forum with reasonableness review.[7]

The timing complicated things even further. For one thing, *Rowe*, a decision this Court issued after *Rosenberger* and *Good News Club*, applied the stricter legal test of *Jones* (rather than reasonableness review) to speech restrictions at a city council meeting. *Rowe*, 358 F.3d at 802–03. And no intervening Supreme Court precedents since *Rowe* explain the subsequent shift in the tests this Circuit has applied either to limited and designated public forums generally, or to speech restrictions in city council meetings specifically. For another, *Jones* and *Good News Club* agree on the test to be applied in a designated public forum—strict scrutiny for content-based restrictions, narrow tailoring in service of a significant governmental interest for content-neutral restrictions—even if they might disagree on what types of government-owned spaces fall under that label. Last but not least, neither *Good News Club* nor *Rosenberger* dealt with a city council meeting—unlike both *Jones* and *Rowe*. That means all of our not-quite-reconcilable precedents were not-quite-overruled.

No longer. The Supreme Court's limited public forum cases—beginning with *Rosenberger* and continuing with *Good News*

_____

[7] These were not the last word on the subject. Later cases largely hew to the *Bloedorn* formulation of the limited public forum. *See, e.g.*, *Keister*, 29 F.4th at 1252–57 (finding a sidewalk on a public university's campus limited to student use to be a limited public forum subject to reasonable-and-viewpoint-neutral review).

22-11421              Opinion of the Court                    17

*Club* and *Christian Legal Society*—have supplanted the outdated rule from *Jones* and *Rowe*. As *Rosenberger* explained, when a government opens a limited public forum for a particular purpose, it "may legally preserve the property under its control for the use to which it is dedicated." 515 U.S. at 829 (quotation omitted). Still, it "must respect the lawful boundaries it has itself set." *Id.* Restrictions on speech must be viewpoint neutral and "reasonable in light of the purpose served by the forum." *Id.* (quotation omitted). In *Good News Club*, the Court reaffirmed that definition and the standard that goes along with it: the government can create a limited public forum reserved "for certain groups or for the discussion of certain topics," so long as its restrictions are reasonable and viewpoint neutral. 533 U.S. at 106–07 (quoting *Rosenberger*, 515 U.S. at 829). And again, in *Christian Legal Society*: "governmental entities establish limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." 561 U.S. at 679 n.11 (quotation omitted). In a limited public forum, the government "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.* (quotation omitted).[8]

---

[8] At the risk of gilding the lily, here is *Pleasant Grove City*: "The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." 555 U.S. at 470 (citation omitted). And *Walker*: "a limited public forum . . . exists where a government has reserved a forum for certain groups or for the discussion of certain topics." 576 U.S. at 215 (alteration adopted and quotation omitted).

### III.

With the categories clarified, labeling this forum is easy. We can quickly dispense with the two opposite poles, traditional and nonpublic forums. The City of Homestead's city council meetings are not traditional public forums—there is no longstanding tradition that these meetings or others like them are held open for undifferentiated public discourse like streets or parks. Nor are they nonpublic forums like mailboxes, military bases, or jails—government-owned property "not by tradition or designation a forum for public communication." *Mansky*, 585 U.S. at 11–12 (quoting *Perry*, 460 U.S. at 46); *see U.S. Postal Serv.*, 453 U.S. at 128–29; *Greer*, 424 U.S. at 838; *Adderley*, 385 U.S. at 47–48. By deliberately opening up City Hall and inviting the public to speak, the City has moved beyond simply "managing its internal operations." *Walker*, 576 U.S. at 216 (quotation omitted).

As between the categories in the middle of the spectrum, designated and limited public forums, the Supreme Court instructs us to look to two features—whether the forum is limited to a specific class of speakers, and whether the forum is limited to speech on specific topics. If either (or both) is present, we have a limited public forum. *Id.* at 215; *see also Rosenberger*, 515 U.S. at 829. Here, though the public comment periods are open to the public at large (not to a specific class of people like "Homestead residents"), the council limits speech to matters "pertinent to the City." This rule sets out a content-based restriction defining the scope of the forum. For that reason, the Homestead city council meetings are limited public forums. That will often be the forum type for city council

meetings, school board meetings, and the like, but it is not a blanket rule—the facts must be considered in each case.

In a limited public forum, as we have said, the government's restrictions on speech "must not discriminate against speech on the basis of viewpoint" and "must be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106–07 (quotation omitted). We will leave it to the panel to apply those standards here, noting only that although reasonableness is a "forgiving test," it is not a meaningless one. *Mansky*, 585 U.S. at 16–17.

⋆          ⋆          ⋆

The City of Homestead has opened its city council meetings to public comment limited to a specific subject matter. That makes these meetings limited public forums, and any restriction on speech—like the decision to bar James McDonough—must be reasonable in light of the purposes served by the meetings and may not discriminate on the basis of viewpoint. We **REMAND** to the panel for application of this standard to the facts of this case.

22-11421                ABUDU, J., Concurring                1

ABUDU, Circuit Judge, concurring:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion . . . . To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. [Yet], [w]e cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Cohen v. California*, 403 U.S. 15, 24–25 (1971) (internal citations omitted).

These are the powerful words of Justice John Marshall Harlan who over 50 years ago predicted that courts would become a tool for sanctioning and, thus, advancing authoritarianism through increased restrictions on free speech.[1] While I concur in the Court's Majority Opinion, I write separately to revive Justice Harlan's concerns regarding the danger of granting public officials far too much discretion in excluding government-owned property as a "marketplace of ideas" for public discourse. *See Red Lion*

---

[1] *See also United States v. Kokinda*, 497 U.S. 720, 758 (1990) (Brennan, J., dissenting) ("Ironically, these public forum categories – originally conceived as a way of preserving First Amendment rights . . . have been used in some of our recent decisions as a means of upholding restrictions on speech." (internal citations omitted)).

2                    ABUDU, J., Concurring                    22-11421

*Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . .").  Today's ruling is based on the Supreme Court's decisions in *Rosenberger*, *Good News Club*, and *Walker*,[2] which identified four categories of fora when determining the level of scrutiny to apply to Defendant-Appellee the City of Homestead, Florida's (the "City")[3] restrictions on Plaintiff-Appellant James Eric McDonough's First Amendment rights during city council meetings.  As precedent currently stands, it was not illogical for McDonough to concede that the council meetings occur in a limited public forum.  However, questions regarding the lack of historical support and, consequently, the arbitrary creation of a "limited public forum" remain legitimate.  Moreover, the State of Florida's position in this case, which is all about further expanding "government control" over speech—its words, not mine—heightens the importance of resolving this quandary sooner rather than later.[4]

## I.    McDonough's Basis for Appeal and *En Banc* Review

The City of Homestead holds monthly city council meetings at its City Hall.  *See McDonough v. Garcia*, 90 F.4th 1080, 1085

---

[2] *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995); *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015).

[3] References to the City also include the individual Defendant-Appellees, unless otherwise noted.

[4] While not a named party, the State of Florida participated as amicus curiae.

22-11421          ABUDU, J., Concurring                    3

(11th Cir.), *vacated and reh'g en banc granted*, 93 F.4th 1220, 1221 (11th Cir. 2024).  A previous panel of this Court described the relevant facts as follows:

> During the comment portion of these meetings, members of the public are invited to speak for three minutes at a time on any matters 'pertinent to the City.' James McDonough was a regular, attending and speaking at more than half of the meetings held between 2015 and 2017. But it did not always go smoothly; the City had stopped him from completing his remarks several times.
>
> Things came to a head during the July 2016 meeting. McDonough rose to address the council, and spoke for about two-and-a-half minutes without incident. He touched on various subjects, including alleged police misconduct, body cameras, and claims of nepotism within the police department. But toward the end of his allotted time, things took a turn for the worse. McDonough loudly confronted a city councilman, launching a personal challenge: 'The last point I'd like to hit off with is, Mr. Maldonado, you know I'd appreciate it if you got something to say to me, you can come say it in my face, and you don't have to talk about me behind my back in public to other people.' Sergeant Garland Wright, who later testified that he took these comments as a threat, quickly approached the podium and ordered McDonough to leave.

*Id.* As stated earlier, McDonough's actions and his encounter with law enforcement resulted in his ejection, arrest, and banishment. *Id.* at 1085-86.

This *en banc* appeal comes before the Court after McDonough filed a 42 U.S.C. § 1983 action against the City and several city police officers for removing him from a council meeting, arresting him on the premises, and issuing a permanent ban against him from attending any future meetings, in violation of his civil rights under the First and Fourteenth Amendments. Specifically, McDonough challenged Wright's issuance of a trespass order that barred McDonough from attending all future Homestead City Council meetings without receiving prior approval from the City. The district court granted summary judgment for the City, finding that McDonough had not shown a deprivation of his rights.

On appeal, a panel of this Court analyzed McDonough's First Amendment claims under the "designated public forum" rubric, and affirmed in part, and reversed in part, the district court's summary judgment order in favor of the City. *Id.* at 1098. In so holding, the panel recognized that more recent Supreme Court opinions suggested that the correct outcome might be different, but because this Court's prior precedent—defining the council meeting as a designated public forum—remained good law, the panel was bound to apply it.

22-11421                ABUDU, J., Concurring                          5

## II.    Evolving Legal Standards for First Amendment Protections

For over forty years, the Supreme Court has held that the application of the First Amendment and its inherent limitations on governmental authority varies by location.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44-46 (1983).  As the Court has explained, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Id.* at 44.  For that reason, "the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

Because the government's authority to restrict speech varies by the nature of the property, courts faced with a First Amendment challenge on publicly-owned property must first determine what category of forum is involved.  *See id.*; *see also Good News Club*, 533 U.S. at 106 ("The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum.").  Because the legal standard for speech restrictions varies by forum, the type of forum at issue is paramount to avoid unconstitutional restrictions on one's free speech rights.  This is especially true given the Supreme Court's repeated recognition that, to be a legitimate and credible representative of the People, the official business and

6                              ABUDU, J., Concurring                        22-11421

behavior of politicians, when acting in their official capacity, must be transparent and open for public inspection and comment.

Whether intentionally and firmly established, or unthoughtfully constructed, the Supreme Court's creation of the "limited public forum" allows the City to reduce access to its council meetings during public comment to "certain groups," and to narrow the discussion of "certain subjects" based on what the City dictates. *Christian Legal Soc. Chapter of the Univ. of California v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009))[5]; *see also Perry Educ. Ass'n*, 460 U.S. at 45. Importantly though, and still good law, a limited public forum does not permit the City to "exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint."[6] *Christian Legal Soc. Chapter of the Univ. of California*, 561 U.S. at 685. Put differently, in a limited public forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Pleasant Grove City*, 555 U.S. at 470 (citing *Good News Club*, 533 U.S. at 106–07). As one panel member asked during the *en banc*

---

[5] In *Christian Legal Society*, the Court described "three categories" of government property, but this does not appear to be a reversion to the *Perry* framework. 561 U.S. at 679 n.11 (listing only traditional public fora, designated public fora, and limited public fora).

[6] It appears that discussion of limited public fora typically uses the term "viewpoint neutral" rather than "content neutral." Presumably, this is because limited public fora inherently allow the exclusion of content entirely unrelated to the purpose for which the forum was created.

oral argument, "is a limited public forum just a designated public forum, but with a content restriction attached to it?"  Oral Argument at 29:15-22, *McDonough v. City of Homestead, et. al.*, (No. 22-11421).

Notably, one of the key cases defining a "designated public forum" remains good law.  In *Arkansas Educational Television Commission v. Forbes*, the Supreme Court concluded that:

> [d]esignated public fora are created by purposeful governmental action opening a nontraditional public forum for expressive use by the general public or *by a particular class of speakers*.  If the government excludes a speaker who falls within the class to which such a forum is made generally available, its action is subject to strict scrutiny.

523 U.S. 666, 667 (1998) (emphasis added) (internal citations omitted).

Some might distinguish Forbes' definition of a designated public forum from a limited public forum by focusing on the "particular class of speakers" language, which is very similar, if not arguably identical, to the "certain groups" criterion defining a limited public forum.  The very close definitions between the two inform the "unthoughtfully constructed" comment above.

## III.    The Collateral Consequences of Unfettered Governmental Discretion

The Supreme Court has manufactured, and our Circuit has been forced to embrace, four categories of fora, but only two

8                          ABUDU, J., Concurring                          22-11421

applicable legal standards.  Thus, the legality of the government's diminution of free speech protections depends on which side of that dividing line the City's forum falls, and the City has most of the power in determining which side of the line it chooses to be.

The State was granted leave to submit an amicus brief and participated in oral argument, and its argument deserves at least a little discussion.  The State invites this Court to "clarify that, when the State or a private party hosts a forum, the degree of control that it actively exerts over the forum is *key* in determining the scope of the First Amendment's protections."  En Banc Brief of the State of Florida as Amicus Curiae in Support of Defendants-Appellees, *McDonough v. City of Homestead, et. al.*, (No. 22-11421) at 2 (hereinafter "State's Brief") (emphasis added).  The broader definition and application of the "control" factor the State seeks to cement could eventually run counter to "[t]he general proposition that freedom of expression upon public questions is secured by the First Amendment" and that this "constitutional safeguard . . . 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'  *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).  Undoubtedly, "[w]hen the government speaks, it may refuse to endorse or freely remove speech of which it disapproves."  *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021).  In *Leake*, this Court recognized that there is no "precise test" for what constitutes government speech, but that whether the government "'maintains direct control over the messages conveyed'" is a consideration – not "key" as the government proposes.  *Id.* (quoting *Cambridge Christian Sch. Inc. v. Fla. High Sch.*

*Athletic Ass'n*, 942 F.3d 1215, 1234 (11th Cir. 2019)).    Therefore, while the "certain groups" and "certain subjects" criteria might determine what to call the forum, what comes first is the government's almost unfettered ability to dictate the "certain subjects" it chooses to allow.  *See* State's Brief at 19-20 (arguing, without identifying any authority, that "control usually determines the nature of a forum," while subsequently acknowledging that "[d]istrict courts have expressed uncertainty in recent years over how to analyze different forums . . . and often consider a variety of factors without anchoring their analysis of the factors in control.").

Although the State agrees with the parties that the City's council meetings are held in a limited public forum, its end goal is more expansive.  *See* State's Brief at 23 ("The degree of control the State actually exercises is what matters, not the specific means by which control is exercised.").  The State essentially argues that we should adjust our forum analysis and find that public fora exist on a continuum—on one end traditional public fora, and "[o]n the other end is a forum in which the private speech that is permitted to occur has been so co-opted by the State that it becomes the government's own speech." *Id.* at 3.  The State's contention is that the level of control the government exercises over a forum should determine its discretion to regulate the forum and, therefore, the allowable speech, claiming "[c]ontrol is a guardrail for forum analysis." *Id.* at 20.  Although "control" is one of three factors courts use

to distinguish government speech from private speech,[7] the amicus brief proposes a significant paradigm shift by extending this control analyses to the determination of whether a forum falls somewhere on the continuum outside of government speech. Thus, governing bodies may be incentivized to enact stricter control measures over fora that lean toward the "public fora" end of their proposed continuum in order to broaden their power to regulate the speech allowed therein.

The State's reliance on the proposition that "the host's degree of control over the forum evidences its function," *id.* at 4, exposes the dangers of a heavy control-focused analysis. This proposed shift carries troubling implications. If entertained, let alone accepted, the State's theory would pave the way for Florida's governing bodies to regulate and control fora far beyond government speech that could ultimately undermine the First Amendment's historical meaning and eviscerate its ongoing application. *See Cornelius*, 473 U.S. at 815 (Blackmun, J., dissenting) ("[T]he use of government property for expressive activity helps further the interests that freedom of speech serves for society as a whole; it allows the 'uninhibited, robust, and wide-open' debate about matters of public importance that secures an informed citizenry . . . and it helps to ensure that government is 'responsive to the will of the people.'" (internal citations and quotation marks omitted)).

---

[7] *See Leake*, 14 F.4th at 1248.

Thankfully, today's decision, by not embracing this attempted government overreach, rejects Florida's end goal and frustrates any strategy aimed towards less transparency, less accountability, and overall dominance over the thoughts and expressions of the People. As Justice Alito reasoned in his dissent in *Walker*, Florida's preference would "pass[] off private speech as government speech and, in doing so, establish[] a precedent that threatens private speech that government finds displeasing." 576 U.S. at 221 (Alito, J., dissenting); *see also Cohen*, 403 U.S. at 26 ("One of the prerogatives of American citizenship is the right to criticize public [officials] and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." (internal citations omitted)).

For sure, the Supreme Court's failure to engage in a robust discussion regarding the need for a growing category of fora, perhaps, is the door that Florida seeks to walk through in proposing this paradigm shift. Even a rudimentary reading of *Good News Club* and *Rosenberger* reveals that the Court was more concerned with the speech restrictions placed on religious entities as opposed to the application of this judicially-created limited public forum.[8]

---

[8] *See Rosenberger*, 515 U.S. at 831, 837 (finding a university's guidelines governing fund distribution to student organizations violated the First Amendment, reasoning in part that "[b]y the very terms of the [university guidelines], the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints."); *see also Good News Club*, 533 at 108-12 (finding a school's exclusion of

Moreover, as the Majority Opinion explains, the cases upon which this Court relies also did not involve city council meetings. Maj. Op. at 16. Thus, the courts are left with the development of categories that have not been well-defined or clearly articulated, but that determine the freedom of speech the public enjoys. Although we decline Florida's invitation, the lesser level of scrutiny the limited public forum analysis allows nevertheless widens the door for the restrictions on freedoms which motivated the masses, through their elected officials, to amend our Constitution and cement up front that federal and state governments shall not "abridge[e] the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

The Majority Opinion's primary goal was to "get our house in order, aligning our public forum doctrine with the [Supreme] Court's latest cases." Maj. Op. at 2-3. Our Court's respect for *stare decisis* and the rule of law require the incorporation of the Supreme Court's current stance on the intersection between government-owned space and the First Amendment. However, the State's brief reminds us not to fall down the slippery slope of government dominance over the will of the People. That is not the society that our Founding Fathers, even as flawed and myopic their own attitudes were, envisioned.

---

a religious club from the use of school facilities based on the club's religious nature "constitutes impermissible viewpoint discrimination.").