[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13325

_____

ARTHUR HUGGINS,

　　　　　　　　　　　　　　　　　　　　Plaintiff-Appellant,

*versus*

SCHOOL DISTRICT OF MANATEE COUNTY,
A Florida Governmental Entity,
MANATEE COUNTY SCHOOL BOARD,
A Florida Governmental Entity,
CYNTHIA SAUNDERS,
In her individual and official capacity,
PAUL DAMICO,
In his individual and official capacity,
MIKE BARBER,
In his individual and official capacity,
ADAM WOLLARD,

In his individual and official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cv-01183-WFJ-TGW

_____

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

ROSENBAUM, Circuit Judge:

Noted free-speech advocate Mike Godwin has remarked that the First Amendment "was designed to protect offensive speech because no one ever tries to ban the other kind." David Pescovitz, *Indecency on the Net*, Cincinnati CityBeat, Mar. 9–15, 1995, at 12, https://digital.cincinnatilibrary.org/digital/collection/p16998coll73/id/6589/rec/17. So true. But offensive speech is in the ear of the hearer.

Here, Plaintiff-Appellant Arthur Huggins criticized Defendants-Appellees the School Board of Manatee County, Florida ("Board"),[1] and District School Superintendent Cynthia Saunders's

---

[1] Huggins brought claims against the "School District of Manatee County" and the "Manatee County School Board." Defendants-Appellees assert that these

22-13325                Opinion of the Court                3

decision to take control of Lincoln Memorial Academy, a local charter school, and to remove its administration.  His fellow community members who agreed with him no doubt took no offense from Huggins's comments.

But we cannot say the same thing about Saunders.  According to Huggins's complaint, because of his comments about the Board and Saunders's actions towards Lincoln Memorial, Saunders prevented Huggins from speaking at a public Board meeting.  She arranged through the school district's Chief of Security, Paul Damico, to have City of Bradenton Police Officer Adam Wollard remove Huggins from the meeting before he had a chance to deliver his remarks.

To Huggins, it was a clear case of viewpoint discrimination and retaliation against his earlier advocacy.

So Huggins sued.  He brought several claims against the Board, the City of Bradenton, and individuals involved in his arrest and the aftermath.  But the district court dismissed Huggins's complaint for failure to state a claim.  Huggins appeals the dismissal of his First Amendment claims and the district court's denial of leave to amend his complaint a second time.

---

are not correct names and that the single entity responsible for the establishment, organization, and operations of schools in Manatee County's district school system is "the School Board of Manatee County, Florida."  Florida law appears to support the same naming convention.  *See* Fla. Stat. § 1001.40.  So we use that term.

After careful consideration and with the benefit of oral argument, we now reverse the district court's dismissal of Huggins's claims against Saunders. Saunders did not satisfy her burden to invoke qualified immunity, and Huggins plausibly alleged his claims. As for the district court's dismissal of the remaining claims, we affirm. We also affirm the district court's denial of Huggins's request for leave to amend his pleadings a second time.

## I.    BACKGROUND

### A. Factual Background

We are reviewing an order of dismissal, so we recount the facts as Plaintiff-Appellant Huggins's First Amended Complaint alleges them. *See Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 856 (11th Cir. 2023).

We start with Defendants-Appellees. The Board operates, controls, and supervises the free public schools in Manatee County. During the events alleged here, Cynthia Saunders served as the District School Superintendent for the Board. In that capacity, she administered and managed the public schools in Manatee County. *See* Fla. Stat. § 1001.32(3). She also supervised instruction. *See id.* As far as the Board went, as District School Superintendent, Saunders served as secretary and executive officer and bore the responsibility of making recommendations to the voting members of the Board. *See id.* §§ 1001.48, 1001.51.

When the Board met on November 12, 2019, Saunders was present.  Among other items, the agenda included a discussion of funding for Lincoln Memorial.

Lincoln Memorial was a Black-owned charter school in Manatee County.  The Board had recently taken control of it and removed its administration.

That did not go over well with several Bradenton community members, including Plaintiff-Appellant Arthur Huggins.  As a result, Huggins and other community members began attending Board meetings to give public comment.  And sometimes, things at the meetings became heated.  In one July 2019 meeting, the Board chair threatened to remove certain community members from the meeting room.  In another, police arrested a community member while he was making a public comment, although charges were dismissed.  Around this same time, the Board imposed new security measures like metal detectors, moved public comment from the beginning to the end of meetings, and required community members who wanted to give public comment to sign up ahead of time.

For his part, Huggins had consistently criticized the Board and Saunders.  He regularly attended Board meetings, where he denounced the Board's decisions to hire Saunders and to remove the administration from Lincoln Memorial.

In August 2019, a local news article quoted Huggins as calling for an "audit" into the activities of the Board and suggesting that the Board had undermined Lincoln Memorial.  Then, in

September, Huggins advocated for disciplinary action against Saunders at a hearing on an administrative complaint from the Florida Commissioner of Education. The Commissioner of Education had alleged Saunders inflated graduation rates for her schools in some years.

That brings us to the night of November 12, 2019. Huggins went to that evening's Board meeting intending to speak about the approval of funds for Lincoln Memorial. But as Huggins walked towards the door, Defendant-Appellee Mike Barber, the school district's Communications Director, told him no seats were available and discouraged him from entering. So Huggins pointed out open seats inside the room. He took a seat and sat for most of the four-hour meeting.

Eventually, though, Huggins's pre-existing back injuries acted up, so he stood up quietly against the rear wall to relieve his back pain. That's when things escalated.

Defendant-Appellee Paul Damico, the school district's Chief of Security, went over to Huggins. He told Huggins to "either have a seat or leave the meeting." Damico added that Saunders, his boss, was giving this order.

Huggins tried to explain that he was standing only to address his back pain. But Damico immediately left and fetched Defendant-Appellee City of Bradenton Police Officer Adam Wollard.[2]

---

[2] Huggins's complaint alleges that Officer Wollard is both "employed as a police officer for the City of Bradenton and as a security officer by the . . . Board."

Wollard instructed Huggins to leave the room. So Huggins went to wait in the main lobby. But there, Wollard placed his hand on Huggins's back and ushered him outside. Huggins was not allowed to return that night to give his public comment.

But the story doesn't end there. Huggins gave interviews to local news outlets about his removal. In them, he strongly criticized his treatment at the Board meeting.

At the next week's meeting, Saunders apologized to the Board for the incident. She said, "the public is welcome inside this chamber," and pledged to "do better to make sure everyone is safe, and everyone feels that they are welcome." One Board member apologized to Huggins for his removal and promised, "that will not happen to you or anybody else again." Another called for an executive session with staff to go over the Board's safety protocols.

The Board and staff held that executive session in early December. There, Mike Barber, the school district's Communications Director, showed the Board a video he had created. That video combined clips of public meetings in other states where attendees had gotten violent against board members with footage of Huggins's removal from the November 12 meeting. Barber then shared the video with the *Sarasota Herald-Tribune*. The paper published the video online, where it remains today.

### B. Procedural History

Huggins filed suit in state court against the Board, Saunders, Damico, Barber, and Wollard in April 2022. The next month,

Defendants removed the case to the U.S. District Court for the Middle District of Florida. After the district court granted Defendants' motions for a more definite statement, Huggins filed the operative First Amended Complaint ("Complaint"). The Complaint alleges 19 counts, including violations of the First Amendment, the Fourth Amendment, the equal protection clause of the Fourteenth Amendment, the equal benefit clause of 42 U.S.C. § 1981, and several state laws.

Defendants moved to dismiss the Complaint. And Huggins sought leave to amend his pleadings a second time. The district court denied Huggins's motion and granted Defendants' motion to dismiss. In its order dismissing the Complaint, the court said that the Complaint continued to suffer from "multiple pleading deficiencies previously identified" in its earlier orders. Still, the court addressed the substance of Huggins's claims.

The district court dismissed Huggins's federal claims with prejudice under Rule 12(b)(6) of the Federal Rules of Civil Procedure. It held that the individual Defendants were entitled to qualified immunity and Huggins had not established that the Board or City of Bradenton were subject to municipal liability.[3] As for Huggins's state claims, the district court declined to exercise supplemental jurisdiction over them. Huggins now appeals.

---

[3] Huggins sued Officer Wollard in both his individual capacity and in his official capacity. The claims against Wollard in his official capacity are effectively claims against Wollard's employer, the City of Bradenton. *See McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997).

## II.    LEGAL STANDARD

We review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1278 (11th Cir. 2019). We accept a complaint's well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1275 (11th Cir. 2018).

"Although we ordinarily review district court orders denying leave to amend a complaint for abuse of discretion . . . we review such decisions de novo when the denial is based on a legal determination that amendment would be futile." *Taveras v. Bank of Am., N.A.*, 89 F.4th 1279, 1285 (11th Cir. 2024) (quotation marks and italicization omitted).

## III.    DISCUSSION

We address Huggins's appeal in five parts. First, we assess his First Amendment claims against Saunders. We hold that Saunders did not satisfy her burden to invoke qualified immunity and that Huggins pled sufficient facts to state a claim against her. Second, we consider the claims against Damico and Wollard. We determine that the district court properly granted them qualified immunity. Third, we conclude that the district court also was correct to dismiss the claim against Barber because he's entitled to qualified immunity. Fourth, we review Huggins's claims against the Board and the City of Bradenton. There, we affirm the district court's decision that he failed to establish municipal liability. Fifth, we

uphold the district court's denial of leave for Huggins to further amend his Complaint.

### A. Saunders

Huggins alleges that Saunders violated his First Amendment rights in two ways when she directed his removal from the November 12, 2019, Board meeting. Count 9 asserts that Saunders abridged Huggins's free-speech rights by preventing him from giving public comment. And Counts 11 and 16 allege that Saunders caused Huggins to be expelled in unconstitutional retaliation for his prior speech.[4]

The district court dismissed these claims on the basis of qualified immunity. Because Saunders fails to carry her burden to invoke qualified immunity and because Huggins plausibly alleges speech-restriction and First Amendment retaliation claims against her, we reverse.

### 1. Qualified Immunity

We begin with qualified immunity. The doctrine shields government officials performing discretionary functions from civil

---

[4] Count 11 discusses "freedom of speech (retaliation)." And Count 16 addresses "governmental retaliation after petition for redress of grievances." The same standard applies to alleged retaliation for a plaintiff's speech or for the exercise of his right to petition the government. *See DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288–89 (11th Cir. 2019). Both counts rest on the same alleged act of retaliation and reference Huggins's same allegedly motivating earlier public comments. We analyze Counts 11 and 16 together for purposes of this decision.

liability unless their conduct violates clearly established statutory or constitutional rights that a reasonable person would have known about. *Baker v. City of Madison*, 67 F.4th 1268, 1278 (11th Cir. 2023). We employ a burden-shifting analysis to assess whether a government official's conduct is protected.

First, a government official raising a defense of qualified immunity must "prove that [s]he acted within the scope of h[er] discretionary authority." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). That means she must have acted (1) in accordance with her job-related duties, and (2) within the scope of her authority. *Id.* When considering this showing, the district court must "look[] to the general nature of [the defendant's] action," temporarily disregarding the alleged illegality of that act. *Id.* at 1231 (quoting *Est. of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018)).

Second, if the defendant makes her discretionary-authority showing, the burden shifts. The plaintiff must then show (1) that the defendant "violated [his] statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Saunders has not carried her burden to invoke the protection of qualified immunity. She has not shown that directing the removal of a community member from a Board meeting falls within the scope of her discretionary authority.

To be sure, Florida law vests in the "presiding officer" of a district school board meeting the authority to "order the removal

. . . of any person interfering with the expeditious or orderly process of such meeting." Fla. Stat. § 1001.372(3). But Huggins alleges that the Board's chair, Dave Miner[5]—not Saunders—was the "presiding officer" at the November 12, 2019, meeting. First Am. Compl. ¶ 33, Dist. Ct. ECF No. 37. On a motion to dismiss, we accept that allegation as true.

Saunders does not establish that she had been delegated the presiding officer's authority to remove unruly members of the public, either.[6] Instead, she suggests we should draw this conclusion from allegations that Saunders at all relevant times "acted under color of law as a Superintendent of, and with the authority of . . . [the] Board."

But we read the Complaint in the light most favorable to the nonmoving party (here, Huggins), *Julmist v. Prime Ins. Co.*, 92 F.4th 1008, 1016 (11th Cir. 2024), and we understand this allegation to assert the facts necessary to invoke our color-of-law precedent, *cf. Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001) ("A

---

[5] At times, the Complaint also refers to the Board chair as "Todd Miner." Public reporting uses the name "Dave Miner." *See* Giuseppe Sabella, *Manatee County School Board Member Dave Miner Files for Re-election*, Bradenton Herald (May 22, 2020, at 18:54 ET), https://www.bradenton.com/news/local/education/article242938381.html [https://perma.cc/L98U-UMKN].

[6] Huggins alleges in an unrelated equal-protection count that "[t]he BOARD delegated the duty reserved to the presiding chair and deferred it to SAUNDERS who instigated the detainment and removal of Plaintiff, an African American, for standing in the same manner as white citizens." We understand this as an alternative theory of relief, *see* Fed. R. Civ. P. 8(d)(2)–(3), so we do not treat this allegation as defeating those in the relevant counts.

22-13325                Opinion of the Court                13

person acts under color of state law when he acts with authority possessed by virtue of his employment with the state."). Saunders also doesn't point to any indication that the presiding officer directly warned Huggins before Officer Wollard removed him. Yet state law appears to require such a warning. *See* Fla. Stat. § 1001.372(3). Because she fails to show that she acted within the scope of her discretionary authority, Saunders cannot successfully invoke qualified immunity.[7]

---

[7] Even if Saunders were able to establish that she had authority to remove Huggins as an "executive officer" of the Board, *see* Fla. Stat. § 1001.48, qualified immunity would not protect her from liability. Officials performing discretionary functions are still liable for violations of clearly established rights. And as we explain later in this opinion, Huggins plausibly alleges that Saunders prevented him from speaking because of his viewpoint. The right to be free from viewpoint-based discrimination is a foundational—and long clearly established—constitutional right. *See, e.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1282 (11th Cir. 2004).

Huggins also alleges that Saunders arbitrarily applied the Board's disorderly-conduct rule to him. Specifically, Huggins alleges that Saunders had him removed for "standing at the rear wall, in a nondisruptive manner" and that no other citizen had been removed for similar behavior under the rule. Because we ultimately conclude that Huggins has stated a claim based on viewpoint discrimination, we don't need to decide whether the Board's disorderly-conduct policy is reasonable in light of the forum's purpose or whether Saunders's allegedly arbitrary enforcement of the disorderly-conduct rule violated Huggins's clearly established First Amendment right. *Cf. Minn. Voters All. v. Mansky*, 585 U.S. 1, 16–17, 21–22 (2018) (concluding that a prohibition on "political" apparel in polling places created a risk of arbitrary enforcement due to vague statutory language, "haphazard" official interpretations, and significant discretion vested in election officials).

2.  Speech Restriction

Because Saunders is not entitled to qualified immunity, we next consider whether Huggins stated claims upon which relief may be granted.  *See Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 864 (11th Cir. 2024) (holding that we can affirm the district court for any reason in the record); Fed. R. Civ. P. 12(b)(6).  As it turns out, Huggins has alleged sufficient facts to plausibly plead both his speech-restriction and retaliation claims against Saunders.  So we reverse the district court's judgment as to these claims.

Huggins bases his speech-restriction claim against Saunders on a straightforward theory of viewpoint discrimination.  That type of claim requires us to conduct a forum analysis to determine the appropriate standard to apply to Saunders's alleged censorship of Huggins's speech.  *McDonough v. Garcia*, 116 F.4th 1319, 1322 (11th Cir. 2024) (en banc).

We have referred to four types of fora: the traditional public forum, designated public forum, limited public forum, and non-public forum.  *Id.*  We often classify public comment periods at school-board meetings as limited public fora.  *Id.* at 1328–29.  But whether a specific public comment period is a designated public forum or a limited public forum is fact-dependent.  *Id.*  And Huggins's complaint doesn't clarify whether the Board reserved its public comment period "for certain groups or for the discussion of certain topics."  *Id.* at 1328 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001)).  Still, even assuming the less-

protective standard of a limited public forum applies here, Huggins plausibly pleads that Saunders violated his First Amendment rights.

The government may restrict speech in a limited public forum only if the restrictions are both (1) reasonable in light of the forum's purpose and (2) viewpoint neutral. *Id.* at 1329. We do not address the reasonableness requirement here because, as alleged, Saunders's removal of Huggins was not viewpoint neutral. *See id.* at 1324 (recognizing that reasonableness and viewpoint neutrality are distinct requirements). So if Huggins can prove his allegations, Saunders's removal of him violated the First Amendment. After all, Saunders knew the opinion Huggins wished to convey, ordered his removal, and—we can reasonably infer—did so because of Huggins's viewpoint.

First, Huggins alleges that Saunders knew he intended to speak about "approval of funds for Lincoln Memorial." And his other allegations support that conclusion. Huggins asserts that the Board required community members to sign up before giving public comment, and Huggins had a history of speaking out against the Board's actions at Lincoln Memorial. Indeed, Huggins averred that he frequently participated and spoke at Board meetings earlier in the year. And as Saunders notes, the law required her to attend those meetings. Fla. Stat. § 1001.51(2); *see also id.* § 1001.48 (establishing superintendent as secretary of the district school board).

A local TV news station had also recently quoted Huggins's criticism of the Board's funding decisions on Lincoln Memorial, the very topic on the Board's agenda the night that Saunders had

Huggins removed from the meeting. So we can reasonably infer that Saunders believed Huggins would express similar criticism at the November 12, 2019, meeting. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1228 (11th Cir. 2017).

Second, Damico told Huggins that Saunders was the one who ordered Huggins's removal from the meeting.

Third, for two reasons, we can reasonably infer that Saunders ordered Huggins's removal because of his viewpoint.

For one thing, "[s]uspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004). That principle applies with even more force here. Saunders and the Board were receiving public pressure from the media, community members, and the state Commissioner of Education, including for their decisions about Lincoln Memorial, the topic Saunders knew Huggins planned to speak about.

And for another, the record contradicts Saunders's alternative rationale. Saunders suggests that she ordered Huggins removed to uphold content-neutral "decorum-based" policies that "apply equally to all citizens"—a run-of-the-mill time, place, and manner limitation. But Saunders later apologized to the rest of the Board for the "incident." And that wasn't the only apology. The Board's vice-chair also apologized to Huggins for his removal and said, "that will not happen to you or anybody else again."

Plus, Saunders acted without following the established procedures for maintaining decorum. The Board's written policy gives the Board chair the power to remove unruly attendees. State law also appears to require the presiding officer (the chair) to issue a warning before removing someone who is "interfering with the expeditious or orderly process" of a meeting. Fla. Stat. § 1001.372(3). But the Board chair did not participate in Huggins's removal.

It's tough to square these allegations—which we must accept as true—with a content- and viewpoint-neutral effort to maintain decorum. Along with Saunders's knowledge of Huggins's viewpoint, these allegations support the reasonable inference that Saunders removed Huggins because of his "specific motivating ideology or . . . opinion or perspective." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). And a purportedly content-neutral restriction can't stand if a desire to suppress a particular viewpoint actually motivates it. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985).

At this stage, Huggins has met his burden to plausibly plead that Saunders violated his First Amendment rights by restricting his speech because of his viewpoint.[8]

---

[8] Huggins also seeks to support his First Amendment claim against Saunders by referencing the unbridled-discretion doctrine. We don't think that doctrine fits the alleged facts here. The unbridled-discretion doctrine permits a facial challenge to a particular type of speech regulation—one that gives a

3.  First Amendment Retaliation

Huggins has also plausibly alleged First Amendment retaliation by Saunders.  We have set out three requirements to state a First Amendment retaliation claim:

> (1) [the plaintiff] engaged in constitutionally protected speech, such as h[is] right to petition the government for redress; (2) the defendant's retaliatory conduct adversely affected that protected speech and right to petition; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech and right to petition.

*DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).  For purposes of this motion to dismiss, Huggins satisfies all three.

First, it's beyond debate that the First Amendment protects Huggins's planned speech.  *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing unprotected categories); *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1234–35 (11th Cir. 2017) (noting lesser protection for commercial speech).

Second, as for an adverse effect on protected speech or petitioning, we consider whether the allegedly retaliatory conduct

---

government official the discretion whether to permit or forbid speech but lacks adequate standards to guide her decision.  *See Barrett*, 872 F.3d at 1221–22.  But here, Huggins alleges that Saunders had him removed even though the Board's policy vested *someone else*—the chair—with the authority to do so.

"would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bailey v. Wheeler*, 843 F.3d 473, 481 (11th Cir. 2016) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005)). This presents an objective question. *Bennett*, 423 F.3d at 1251.

Huggins has alleged enough facts to show that the alleged retaliation would deter a person of ordinary firmness. For starters, being ordered out of a meeting room by a chief of security and a police officer can be, as Huggins alleges, humiliating and damaging to a person's personal reputation. That's particularly true here because members of the community widely attended the Board meetings in 2019. And "'since there is no justification for harassing people for exercising their constitutional rights,' the adverse effect 'need not be great'" to support a violation. *Echols*, 913 F.3d at 1323 (quoting *Bennett*, 423 F.3d at 1254).

Plus, Huggins's expulsion showed Huggins that he would face a hard choice if he tried to express his views at a future meeting. He could endure potentially several hours of physical pain from his injuries while sitting through the lengthy proceedings before public comment. Or he would risk a credible threat of arrest if he again sought to relieve his pain by standing in the back of the hearing room or in the lobby until his time to speak came.

"The threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023). Huggins's removal was no "mere frown from a

supervisor." *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The involvement of a police officer in removing Huggins, that officer's physical "forc[ing]" of Huggins out of the lobby, and the "unlawful[] arrest" of another community member during a recent Board meeting made arrest a real threat if Huggins chose to persist.

Defendants highlight allegations they say suggest Huggins may have returned to another Board meeting the following week. But again, this is an objective inquiry. And we consider a person of ordinary firmness. Whether Huggins was willing to risk discomfort and arrest is irrelevant.[9] So we have no trouble concluding that Huggins has satisfied the second requirement.

Huggins also satisfies the third requirement—causation. Huggins must show that his speech was a but-for cause of Saunders's adverse action against him. *See Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). Because producing direct evidence of an official's inner motivations is often not possible, we have relied on circumstantial evidence to establish the causal link. *See Bailey*, 843 F.3d at 483. Other circuits adopt the same practice. *See, e.g.*, *Hannon v. Beard*,

---

[9] Of course, the same expulsion that Huggins frames as the "retaliatory conduct" in his First Amendment retaliation claim also prevented him from speaking on November 12, 2019. Earlier in the opinion, we analyzed this alleged harm as part of Huggins's speech-restriction claim. Directly restricting speech strikes us as categorically different than "deterring" a person from speaking. *Bailey*, 843 F.3d at 486. For that reason, we don't consider Huggins's inability to speak later that night within the adverse-effect prong of the First Amendment retaliation inquiry. *See DeMartini*, 942 F.3d at 1289.

645 F.3d 45, 49 (1st Cir. 2011); *Hill v. Lappin*, 630 F.3d 468, 475 (6th Cir. 2010).

Here, several allegations support the conclusion that Saunders caused Huggins to be removed from the meeting because of Huggins's speech. First, Huggins consistently and repeatedly criticized Saunders. He did so both to the Board and in advocating for disciplinary action against Saunders relating to the Florida Commissioner of Education's administrative complaint against her.

Second, the temporal proximity between Huggins's speech and his removal from the Board meeting supports causation. Two months earlier, at the hearing about the Florida Commissioner of Education's administrative complaint, Huggins advocated for disciplinary action against Saunders. To be sure, a gap of two months may be weaker support of a causal link when a plaintiff and defendant interact daily, like in the workplace or a prison. But in these circumstances, where Saunders's and Huggins's interactions were more sporadic, the temporal proximity is rather suggestive. *Cf. Akins v. Fulton County*, 420 F.3d 1293, 1298–99, 1305 (11th Cir. 2005) (holding the "close temporal proximity . . . suggest[s] a causal relationship" where the alleged First Amendment retaliation stretched over the weeks and months after employees reported bidding irregularities by their supervisor); *Anders v. Cuevas*, 984 F.3d 1166, 1177 (6th Cir. 2021) (holding police department's removal of plaintiff's business from list of approved towing companies four months after he participated in investigation of officers supported a reasonable inference of causation).

Third, as we noted, Saunders has offered no viable alternative rationale for removing Huggins. She hasn't identified any way that Huggins violated a decorum policy applicable to Board meetings. And she also apparently ignored the established procedures for removing a disruptive attendee. (Besides, accepting his allegations as true, Huggins was not interfering with the meeting.)

Finally, we have Saunders's apparent admission of wrongdoing in her apology to the Board one week after Huggins's removal.

Of course, Saunders may later present evidence that she lacked retaliatory animus or would have directed Huggins to be removed regardless of his past speech. But the face of the Complaint doesn't support those conclusions. So we reverse the dismissal of Huggins's First Amendment claims against Saunders.

### B. *Damico and Wollard*

Next, Huggins appeals the dismissal of his First Amendment claims against Damico and Wollard in their individual capacities.[10] The district court held that both Damico and Wollard were entitled to qualified immunity. We agree.

We can quickly move past the discretionary-authority step of the analysis. Huggins does not challenge the district court's determination that Damico and Wollard each acted within the scope

---

[10] We discuss the claims against Wollard in his official capacity in the section on municipal liability, Section III.D.

of their discretionary authority.[11] So we turn to the next question for qualified immunity—whether, taking the facts as he alleged them, Huggins showed that these officials violated his constitutional right. *Echols*, 913 F.3d at 1319.

At this step, Huggins's claims against Damico and Wollard suffer from the same fatal shortcoming: a lack of knowledge. Huggins doesn't allege that either of them knew the viewpoint that he intended to convey that night or had expressed in his past speech. At most, Huggins conclusorily alleges that Damico and Wollard intended to restrict his speech or retaliate against him: Huggins alleges, for instance, that "DAMICO, and, WOLLARD, removed Plaintiff from the meeting to abridge his freedom of speech." First Am. Compl. ¶ 127, Dist. Ct. ECF No. 37. But Huggins's assertions are legal conclusions, not well-pleaded factual allegations. And we are not bound to accept them as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

We can't impute Saunders's motive to people who carried out her instructions with no apparent knowledge of her allegedly

---

[11] Huggins's choice not to challenge this aspect of the district court's ruling is meaningful. The scope of our review is "limited to the four corners of the complaint." *Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1282 (11th Cir. 2024) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)). And here, the Complaint does not clearly define the scope of Damico's and Wollard's job-related duties or authority at Board meetings (although Huggins in district court conceded the discretionary-authority point as to Damico). So while it is not obvious from the Complaint that either man acted within the scope of his discretionary authority, we need not decide that question.

unconstitutional reason for giving them. *See id.* at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits[.] [A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Huggins must allege a factual connection between his speech and each individual official's conduct for both his speech-restriction and First Amendment retaliation claims. After all, viewpoint discrimination requires a defendant to have based his conduct on the plaintiff's viewpoint. And retaliation requires that the plaintiff's past speech be the but-for cause of the specific defendant's conduct. So an official who does not even know about Huggins's viewpoint or past speech lacks the necessary connection to that speech to have restrained Huggins's speech and retaliated against him in violation of the First Amendment.[12]

---

[12] Of course, a speech restriction in a limited public forum will also violate the First Amendment if it's unreasonable in light of the forum's purpose. *McDonough*, 116 F.4th at 1329. But the reasonableness prong doesn't alter our conclusion here. We don't analyze Damico's conduct under that prong because Huggins frames his speech-restriction claim against Damico in terms of viewpoint discrimination. The reasonableness prong doesn't help Huggins with Wollard, either. Florida law defines the process for removing disruptive attendees, which culminates with a "law enforcement authority" carrying out the removal. Fla. Stat. § 1001.372(3). Wollard is a police officer who was providing security for the Board. He complied when the Board's Chief of Security instructed him to remove Huggins. But a plaintiff must show the wrongfulness of a defendant's own individual actions to establish Section 1983 liability. *Iqbal*, 556 U.S. at 676. At a minimum, Huggins identifies no "clearly established law" showing that—by failing to refuse the Chief of Security's

22-13325                Opinion of the Court                25

Because Huggins fails to allege that Damico or Wollard knew the content or viewpoint of his speech, Huggins has not shown that either violated his constitutional right. So we affirm the district court's ruling that qualified immunity forecloses Huggins's individual-capacity claims against Damico and Wollard.

### C. Barber

We also affirm the dismissal of Huggins's First Amendment retaliation claim against Barber.[13] Huggins asserts Barber was retaliating against Huggins's speech when he created and disseminated to the *Sarasota Herald-Tribune* the video combining footage of Huggins's removal with instances of violence at public meetings in other communities. The district court held that qualified immunity forecloses liability for Barber. We think the district court got it right.

Once more, we start by asking whether Barber was acting within the scope of his discretionary authority. *Spencer*, 5 F.4th at 1230–31. Barber served as Communications Director for the Board. So sharing materials with the press about Board matters falls well within his discretionary authority.

---

instructions—Wollard is responsible for a speech restriction that was unreasonable in light of the forum's purpose. *Echols*, 913 F.3d at 1323.

[13] Count 12 does not specify on its face whether it is brought against Barber in his individual or official capacity. Based on Huggins's later clarification, the district court construed Count 12 as an individual-capacity claim. We do the same.

We next move to whether the right that Huggins claims Barber violated was clearly established. *Echols*, 913 F.3d at 1319. Courts may analyze this prong of the qualified-immunity analysis and the rights-violation prong in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Huggins points to no clearly established law indicating that merely "insinuating" someone is dangerous can support a First Amendment retaliation claim. As a result, the district court properly held that Barber has qualified immunity against Huggins's claim.

### D. The School Board and the City of Bradenton

Next, we consider Huggins's claims against the Board and the City of Bradenton. Under the *Monell* line of cases, a municipality does not incur Section 1983 liability solely because of its employer-employee relationship with an alleged wrongdoer. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692–94 (1978). Instead, "a municipality may be held liable 'only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law.'" *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (quoting *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1276 (11th Cir. 2000)). Huggins has failed to show that's the case here.

We start with Huggins's claims against the Board. Huggins first suggests that the Board's decorum policy violates his First Amendment rights because it effectively gives Saunders carte blanche to remove citizens because of their views. But this

assertion conflicts with the facts Huggins alleges. That is, Huggins alleges Saunders flouted the requirements of the Board's policy on removing disorderly citizens. So this theory can't work.

Then, Huggins advances a "ratification" theory—that the Board, which has final decision-making authority, assumed responsibility for Saunders's action by failing to intervene. This theory fares no better. When a plaintiff complains about a single incident of misconduct, he must show that the "local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis before a court can hold the government liable on a ratification theory." *Salvato v. Miley*, 790 F.3d 1286, 1296 (11th Cir. 2015) (quoting *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001)). Here, the Board had no ability to review Saunders's action in real time. And then the Board expressed disapproval at the next week's meeting. So a ratification theory doesn't work.

Finally, Huggins gestures towards a "custom and practice theory." But Huggins makes only conclusory allegations that the Board consistently allowed its employees to remove citizens from meetings because of their speech. That doesn't get him where he needs to be.

Beside vague allusions to "similar wrongful and unlawful conduct," Huggins identifies only one specific earlier threat to remove individuals from a meeting and one arrest of another community member during a public-comment period. That's not enough to show a practice "so pervasive and well-settled that it

assumes the force of law.'" *Doe*, 604 F.3d at 1263 (quoting *Denno*, 218 F.3d at 1276).

In short, Huggins can't show that the Board is "actually responsible" for Saunders's actions. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

Huggins's municipal-liability theory against the City of Bradenton fails for the same reason.[14]  He contends that the City "adopted the Board's policy when it allowed its officers to participate" in removing citizens from Board meetings.  But Huggins never shows that a wrongful Board "policy" existed for the City to adopt.

Because Huggins fails to state a claim against the Board or the City of Bradenton, we affirm the district court's dismissal of his First Amendment claims against them.

### E.  Leave to Amend

Finally, Huggins appeals the denial of leave to amend his complaint a second time.  A second amendment to pleadings requires either the consent of the opposing party or the court's leave.  Fed. R. Civ. P. 15(a)(2).  District courts must "freely give leave when justice so requires."  *Id*.  But a district court need not grant leave "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments

---

[14] Huggins's claims against Wollard in his official capacity are effectively against the City.  *See Brandon v. Holt*, 469 U.S. 464, 471–72 (1985).

previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The district court denied Huggins's motion, holding that leave would be futile and would unduly prejudice Defendants. We agree on both points.

As the district court correctly noted, Huggins's proposed Second Amended Complaint had only minimal differences from the operative First Amended Complaint. Huggins does not identify any way that the Second Amended Complaint would alter the outcome of any claim against any Defendant. (The most meaningful changes seem to be *removing* Defendants from certain counts.) None of the proposed changes would strengthen the claims that will move forward against Saunders, either. The futility of Huggins's proposed amendments is reason enough to deny leave. *See Swinford v. Santos*, 121 F.4th 179, 192 (11th Cir. 2024).[15]

_____

[15] Huggins objects to the denial of his motion for leave to amend. But we could construe Huggins's arguments as contesting the district court's decision to dismiss his claims with prejudice. That said, our precedent squarely rejects Huggins's suggestion that he is entitled an opportunity to amend with the benefit of a ruling on the issues posed by Defendants' motions to dismiss. *See Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1075 (11th Cir. 2017). Huggins also identifies no ways that a hypothetical amended complaint would address the flaws underlying the district court's rulings that we uphold today or that he declined to appeal. So if we construe Huggins's argument as contesting the district court's decision to dismiss his claims with prejudice, the same futility problems stand in Huggins's way. *See id.*

But granting leave also would have mooted five then-pending motions to dismiss. So Defendants would have had to expend further time and resources to invoke qualified immunity again, in the face of immaterial changes in Huggins's pleadings. We cannot say that the district court exceeded its discretion in holding that this would unduly prejudice Defendants.

## IV.    CONCLUSION

For the reasons we've discussed, we reverse the district court's dismissal of Counts 9, 11, and 16 against Saunders. We affirm the dismissals with prejudice of those counts as to all other Defendants. We also affirm the dismissals with prejudice of Counts 10 and 12. Because the district court based its decision not to exercise supplemental jurisdiction over the state claims on its dismissal of all of Huggins's federal claims, we vacate that decision. The district court may consider whether exercising supplemental jurisdiction over any or all state claims is now appropriate. We express no view on the proper resolution of that question.

We remand to the district court for further proceedings in accordance with this opinion.

**REVERSED IN PART, AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**